IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ROGER LEWIS COULTER                                                    PETITIONER

V.                                    CIVIL NO. 1:01-cv-01125

WENDY KELLEY, Director
Arkansas Department of Corrections[1]                                  RESPONDENT

## MEMORANDUM OPINION

Petitioner, Roger Lewis Coulter, sentenced to death for capital murder and confined at the

Maximum Security Unit of the Arkansas Department of Correction ("ADC"), seeks a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  In response, Respondent, Wendy Kelley, has asserted multiple

procedural defenses and time bars to Petitioner's claims.  The Court held an evidentiary hearing

on these issues in April 2013 ("Habeas Hearing").  After thorough consideration of the arguments

and evidence presented at the Habeas Hearing and the parties' pre-and post-hearing briefing, the

Court issues this Memorandum Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1989, Petitioner was convicted, in the Circuit Court of Ashley County, Arkansas, of the

rape and capital murder of five-year-old Natasha Phelps and was sentenced to death by lethal

injection.   On appeal from the post-conviction proceedings, the Arkansas Supreme Court

summarized the facts surrounding the rape and murder as follows:

The record reflects that [Petitioner] was living with the child victim and her mother

---

[1] Wendy Kelley is now the active director of the Arkansas Department of Correction.
Accordingly, the Clerk of the Court is **DIRECTED** to substitute Wendy Kelley, Director of
Arkansas Department of Correction for Ray Hobbs, former Director of Arkansas Department of
Correction, as the Respondent in this matter.

in Warren, Arkansas. On the morning of April 12, 1989, [Petitioner] left home with the child and was supposed to take her to the local Headstart center, which he did from time to time. According to the child's mother, [Petitioner] returned home that morning somewhat later than normal, wearing dirty clothes and claiming that he had experienced car trouble. After eating breakfast and bathing, [Petitioner] drove to his mother's house to borrow some money. [Petitioner] was later seen cashing a check from his mother at a local bank. [Petitioner] did not return the child home that afternoon. Her mother and grandmother eventually went to the Headstart center to pick up the child. There, they were informed that the child had not been dropped off that day.

The victim's family filed a missing-person report with the local police, and a search for the child was undertaken. Police officers found the child's body the following day, in a wooded area where witnesses had seen [Petitioner] in his car the day before. The child's partially clothed body was found stuffed inside a hollow tree, covered by some branches and leaves. Testimony from the state's chief medical examiner established that the child had been raped and ultimately died of smothering and strangulation. [Petitioner] was eventually arrested in California, some five weeks after the murder.

*Coulter v. State*, 343 Ark. 22, 26, 31 S.W.3d 826, 828 (Ark. 2000).

In 1991, the Arkansas Supreme Court ("ARSC") affirmed Petitioner's conviction, and the United States Supreme Court denied certiorari later that same year. *Coulter v. State,* 304 Ark. 527, 804 S.W.2d 348 (Ark. 1991), *cert. denied sub nom Coulter v. Arkansas,* 502 U.S. 829 (1991). Petitioner then sought post-conviction relief in the circuit court of Ashley County.  In October of 1999, the circuit court denied all relief, and in November of 2000, the ARSC affirmed.  *Coulter v. State,* 343 Ark. at 35.  On October 1, 2001, Petitioner filed his original Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  (Pet'r's Pet. for Writ of Habeas Corpus, October 1, 2001, ECF No. 3).  On September 16, 2003, Petitioner filed a First Amended Petition.  (Pet'r's Am. Pet. for Writ of Habeas Corpus, September 16, 2003, ECF No. 25).  In this First Amended Petition, Petitioner asserted multiple claims including a claim that he is mentally retarded pursuant to *Atkins v. Virginia,* 536 U.S. 304 (2002) ("*Atkins* Claim").  By Order dated

May 24, 2004, the Court dismissed Petitioner's *Atkins* Claim, in order for Petitioner to return to state court and exhaust that claim. This Order also stayed Petitioner's remaining claims pending his return from state court.[2] (Order, May 24, 2004, ECF No. 27). On January 3, 2007, Petitioner filed a Motion to Lift Stay and Second Amended Petition (Pet'r's Am. Pet. for Writ of Habeas Corpus by a Person in State Custody, January 3, 2007, ECF No. 44).

In his Second Amended Petition, Petitioner made thirteen claims for relief: (1) Petitioner's "death sentence must be vacated because the prosecutor's closing argument violated his constitutional rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985);" (2) "trial counsel rendered constitutionally ineffective assistance at the penalty phase;" (3) the sentence of death "is predicated upon a single invalid aggravating circumstance;" (4) "the trial court violated [Petitioner's] constitutional rights by removing potential jurors for cause based on their views of the death penalty even though the jurors could be substantially fair and impartial;" (5) "the sentencing provisions of Arkansas' capital murder statutes violate the constitution;" (6) Petitioner "is entitled to relief from his death sentence under the Eighth and Fourteenth Amendments because he suffers from mental retardation;" (7) "the trial court unconstitutionally denied [Petitioner] funds to retain an expert to assist in his defense at both the guilt and penalty phases of his trial;" (8) "trial counsel labored under an insurmountable conflict of interest that adversely affected his performance in violation of [Petitioner's] constitutional rights;" (9) Petitioner's "constitutional rights to a fair trial were violated by the trial judge's failure to discharge his duty to protect

---

[2] The May 24, 2004 Order was issued prior to the United States Supreme Court's decision in *Rhines v. Weber*, 544 U.S. 269 (2005) in which the Supreme Court addressed the issue of a district court holding habeas claims in abeyances while the petitioner returned to state court to exhaust claims.

[Petitioner's] right to the effective assistance of counsel at the penalty phase;" (10) "trial counsel rendered constitutionally ineffective assistance at the guilt phase;" (11) "the judge unconstitutionally instructed the jury in the guilty phase that, if it did not convict [Petitioner] of capital murder, his crime might be punished with only a fine;" (12) "errors and omissions by appellate and state post-conviction counsel deprived [Petitioner] of his constitutional rights to effective assistance on appeal and on state collateral review;" and (13) "the Court should conduct a cumulative assessment of whether constitutional errors occurred and whether such errors were prejudicial."  (Am. Pet., ECF No. 44).

Respondent initially filed a Response to the Second Amended Petition on May 1, 2007. (Resp. to Second Am. Pet. for Writ of Habeas Corpus, May 1, 2007, ECF No. 50).  The parties then proceeded to litigate the issues raised in the Second Amended Complaint and original Response over the course of the next two years.[3]

On September 11, 2009, the Court issued an Order establishing a briefing schedule for the parties to specifically address all statute of limitations arguments and procedural defenses in this matter ("Briefing Order").  (Order, September 11, 2009, ECF No. 94).  On October 26, 2009, in

---

[3]The parties filed numerous responses, replies, and traverses arguing the procedural defenses and statute of limitations issues initially raised by Respondent: (1) on August 3, 2007, Petitioner filed a Traverse to Respondent's Answer to Petitioner's Second Amended Petition (Reply to Resp. to Pet'r's Second Am. Pet. for Writ of Habeas Corpus, August 3, 2007, ECF No. 56); (2) on August 14, 2007, Respondent filed a Reply to Petitioner's Traverse to Respondent's Answer to Petitioner's Second Amended Petition (Reply to Traverse to Resp. to Second Amended Habeas Corpus Pet., August 14, 2007, ECF No. 57); (3) on December 3, 2008, Petitioner filed an Amended Reply to Response to Petitioner's Second Amended Petition (Am. Reply to Resp. to Pet'r's Second Am. Pet. for Writ of Habeas Corpus, December 3, 2008, ECF No. 74); (4) on December 15, 2008, Respondent filed a Motion to Strike Petitioner's Amended Reply (Mot. to Strike Pet'r's Am. Reply to Resp. to Pet'r's Second Am. Pet. for Writ of Habeas Corpus, December 15, 2008, ECF No. 78); and finally, (5) on December 26, 2008 Petitioner responded to Respondent's Motion to Strike (Resp. in Opposition to Resp't's Mot. to Strike, December 26, 2008, ECF No. 79).

Response to the Briefing Order, Respondent submitted a document titled "First Amended Response to Petitioner's Second Amended Petition for Writ of Habeas Corpus" ("Amended Response"). (ECF No. 98).   In the Amended Response, Respondent not only clarified the procedural defenses and statute of limitations assertions made in the original Response, but also included additional arguments, including an assertion that Petitioner's original habeas Petition was untimely filed pursuant to the AEDPA.[4]  (Amended Response, ECF No. 98).   On January 25, 2010, in response to the Amended Response, Petitioner filed  a document titled "Reply to Respondent's Briefing Regarding the Statute of Limitations and Procedural Default." ("Petitioner's Reply").   (ECF No. 105).

### DISCUSSION

As explained fully below, the Court finds that Petitioner's original Petition is time barred pursuant to the AEDPA, and this habeas matter should be dismissed with prejudice.   The Court arrives at this conclusion by first addressing the initial matter of whether Respondent's limitations argument is properly before the Court.   Once it is established that the limitations argument should be considered, the Court will analyze whether Petitioner filed his Petition outside of the AEDPA one-year statute of limitations.   Next, the Court will address whether Petitioner is entitled to equitable tolling.   Finally, the Court will address Petitioner's miscarriage of justice arguments against the time bar.[5]

---

[4] The Court notes that Respondent raised multiple statute-of-limitations arguments as well as procedural default arguments relating to each of Petitioner's thirteen claims, however, because the Court determines that Petitioner's entire original Petition is in fact time barred, it need not enumerate those arguments herein.

[5] While the parties have filed numerous and voluminous briefs arguing the many issues raised in Petitioner's Second Amended Petition, the Court finds it unnecessary to enumerate and address

I.      **Arguments Properly Before the Court**

Respondent first argues that Petitioner's original Petition is time barred, therefore, the Court need not consider any claims made by Petitioner and the Second Amended Petition should be dismissed.   Respondent asserted this argument for the first time in his Amended Response. (Resp't's First Am. Resp., 15-20, ECF No. 98).  Before addressing the merits of this statute of limitations argument, the Court must first address Petitioner's assertion that this argument is not properly before the Court.

A.      **Waiver of Limitations Argument**

Petitioner argues Respondent waived this particular statute-of-limitations argument by failing to assert it in his Response to the original Petition.  Further, Petitioner argues Respondent conceded, in his initial Response to the Second Amended Petition, that the original Petition was timely filed.  Respondent filed his Amended Response to the Second Amended Petition on October 26, 2009.   In this Amended Response, Respondent explained that he interpreted the Court's September 11, 2009 Briefing Order to grant him leave to amend his Response or, in the alternative, he requested that the Court grant him leave to so amend.

In support of his waiver argument, Petitioner relies on *Day v. McDonough,* 547 U.S. 198 (2006).  The issue in *Day*, however, is distinguishable from the issue presented here.  In *Day* the Court considered whether a habeas court may, *sua sponte*, dismiss a prisoner's petition for writ of habeas corpus as untimely.  *Id.* at 202.  The *Day* Court explained that habeas courts are "permitted,

_____

each of these arguments herein.  Instead, the Court focuses its analysis on the threshold issue of the AEDPA statute of limitations.  (Amended Response., ECF No. 98); (Pet'r's Reply, ECF No. 105); (Habeas Hearing Tr., April 17-18, 2013, ECF No. 161); (Pet'r's Post-Hearing Br., February 26, 2014, ECF No. 166); and (Resp's Post-Hearing Br., April 28, 2014, ECF No. 171).

but not obliged, to consider *sua sponte* the timeliness of a state prisoner's habeas petition." *Id.* at 209. Further, under the Federal Rules of Civil Procedure, a statute of limitations argument not raised in the answer or response or an amendment thereto is forfeited. *Id.* at 202 (citing Fed. R. Civ. P. 8(c), 12(b), and 15(a)).

Here, the Court is not attempting to raise the statute of limitations argument *sua sponte* as the habeas court did in *Day*. Respondent did not waive his limitations argument, instead, he is attempting to assert it through an amended response just as the *Day* Court explained was an acceptable method. *See Day,* 547 U.S. at 209 (explaining that it would have been acceptable for the habeas court to inform the state of their calculation error and entertain an amended response to the petition). Therefore, in accordance with *Day*, the Court will entertain Respondent's Motion to Amend his Response to Petitioner's Second Amended Petition filed within his Amended Response.[6]

### B.    Respondent's Motion to Amend

Respondent first asserts the Court's Briefing Order granted him leave to amend his Response to the Second Amended Petition. As an alternative, Respondent included a Motion to Amend in his Amended Response.

---

[6]The Court notes Petitioner's argument that a previous order by this Court recognized the timeliness of his original Petition. Petitioner argues that the Court's May 24, 2004 Memorandum Opinion recognizes that the original Petition was timely filed. (ECF No. 27, p. 7.) While Petitioner is correct that the May 24, 2004 Opinion did contain a one sentence statement addressing the timeliness of the original Petition, the timeliness of the Petition was not in issue or contested at the time that Order was issued. Further, the Court did not conduct a *sua sponte* analysis of the timeliness of the original Petition in that Order. Instead, the Court relied on the parties representations, or lack of challenges, to the timeliness of the original Petition. Therefore, the Court will now take this opportunity to properly and throughly analyze the arguments on timeliness properly before it.

After this matter returned to this Court from state court in January 2007, the Court granted Petitioner leave to file a Second Amended Petition setting forth thirteen claims for relief—his five original claims along with eight new claims. (Order, February 5, 2007, ECF No. 47).  Respondent filed his original Response to the Second Amended Petition on May 1, 2007 arguing multiple statute-of-limitations arguments but not asserting that Petitioner's original Petition was untimely filed.  (Resp. to Second Am. Pet., May 1, 2007, ECF No. 50).  Over the course of the next two years the parties litigated the claims raised by Petitioner in his Second Amended Petition and the procedural defenses and limitations arguments raised in Respondent's original Response.  Finally, on September 11, 2009, the Court issued the Briefing Order establishing a briefing schedule for the parties to specifically address all statute of limitations arguments and procedural defenses. (Order, September 11, 2009, ECF No. 94).

In the Court's September 11, 2009, Order the Court specifically stated:

Respondent is hereby **ORDERED** to submit briefing to specifically clarify, as to each of Petitioner's thirteen claims, where Respondent finds the statute of limitations has run, and why; as well as specifically clarify where procedural default, including the failure [to] exhaust claims, has occurred, and why.

(Order, September 11, 2009, ECF No. 94) (emphasis in original).  This Order does not expressly grant leave for Respondent to amend his Response, however, Respondent's interpretation is not baseless as the Court did request more information and clarification on Respondent's procedural defenses and limitations arguments asserted in the original Response.  Nonetheless, rather than simply accepting Respondent's Amended Response, the Court will consider Respondent's Motion to Amend filed within his Amended Response.  (Resp't's First Am. Resp., 2, ECF No. 98).

Respondent moves to Amend his Response pursuant to Federal Rule of Civil Procedure

15(a)(2).  Rule 15(a) provides in pertinent part:

> (1) *Amending as a Matter of Course*.  A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>
> (2) *Other Amendments*.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a).

Although leave to amend is to be freely granted under Rule 15(a), the Court has discretion whether or not to grant leave to amend. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–32 (1971).  Factors to consider in determining whether leave to amend should be granted include but are not limited to (1) whether the motion was filed in bad faith or with dilatory motive; (2) whether the motion was filed with undue delay; (3) whether leave to amend would be unduly prejudicial to the opposing parties; and (4) whether the proposed amendment would be futile.  *See Bell v. Allstate Life Ins. Co.,* 160 F.3d 452, 454 (8th Cir. 1998) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

Even though over two years transpired between Respondent's original Response to the Second Amended Petition and his Motion to Amend, the Court finds Respondent's Motion was not filed in bad faith, with dilatory motive, or with undue delay.  First, the parties were actively litigating the issues of procedural defenses and limitations arguments during this two-year time period.  Second, Respondent filed the Motion to Amend and Amended Response in response to a Court order requesting clarification on limitations arguments and procedural defenses.  Lastly,

delay alone is not sufficient justification for denial of a motion to amend.  *See Moore-El v. Luebbers,* 446 F.3d 890, 902 (8th Cir. 2006) (citing *Bell v. Allstate,* 160 F.3d at 454) (Moore-El's purported amendments to his habeas claims were denied based on the futility of the claims not on the delay in asserting the amendments).

Further, allowing Respondent to Amend his Response will not unduly prejudice Petitioner. Petitioner has been afforded the opportunity to provide the Court with arguments on the newly asserted limitations issues in two rounds of briefing (both before and after the evidentiary hearing) and the opportunity to present evidence regarding these issues at the evidentiary hearing.  The Court has all the information it needs to make a ruling on Respondent's new limitations argument. Therefore, Petitioner will not be prejudiced by any further delay if Respondent's Motion to Amend is granted.

Petitioner also argues that allowing Respondent to raise such a claim this late in the litigation prejudices Petitioner because he could have spent his resources seeking other forms of relief if the Petition was initially dismissed as untimely.  The Court is unconvinced by this cursory argument as there was no evidence cited supporting this assertion.

Additionally, allowing Respondent's proposed amendments will not be futile.  In his Amended Response, Respondent urges statute-of-limitations arguments that  if not included in his Response will be waived.  *See Day*, 547 U.S. at 209.  Further, as explained in detail below, the statute of limitations argument is meritorious.

Lastly, the Court notes, that in the interest of justice, it has freely granted amendments for the Petitioner in this matter on multiple occasions over the course of this litigation.  Petitioner has not presented any reason why Respondent should not enjoy the same consideration and application

in the interest of justice.[7]

Accordingly, the Court **GRANTS** Respondent's Motion to Amend his Response to Petitioner's Second Amended Petitioner (ECF No. 98) and considers the document filed at ECF No. 98 to be Respondent's Amended Response to Petitioner's Second Amended Petition.  Because leave to amend has been granted, all of Respondent's statute-of-limitations arguments raised in his Amended Response are properly before the Court at this time.

## II.   Timeliness of the Original Petition

Having found that Respondent's AEDPA statute of limitations argument is properly before the Court, the Court will now proceed to the merits of this argument and Petitioner's responses. Respondent alleges that Petitioner's original Petition was not filed within the one-year limitations period prescribed by the AEDPA, specifically 28 U.S.C. § 2244(d)(1).  Therefore, according to Respondent, Petitioner's original and all subsequent habeas petitions are time barred and should be dismissed with prejudice.  Petitioner argues that his original Petition was timely filed.

### A.   AEDPA Applicable Law

On April 24, 1996, the AEDPA was signed into law.  This law amended the federal *habeas corpus* statutes in many ways, most pertinently by including the addition of a one-year statute of

---

[7] Even though Petitioner did not properly file a motion seeking leave to file his Second Amended Petition, the Court interpreted the filing as one seeking leave to file and granted such leave accepting the Second Amended Petition as filed.  (Order, February 5, 2007, ECF No. 47). Furthermore, Petitioner did not properly seek leave to amend his Reply to the original Response (Am. Reply to Resp. to Pet'r's Second Am. Pet. for Writ of Habeas Corpus, December 3, 2008, ECF No. 74), instead, simply filing the Amended Reply prompting Respondent to file the Motion to Strike (Mt. to Strike Pet'r's Am. Reply to Resp. to Pet'r's Second Am. Pet. for Writ of Habeas Corpus, December 15, 2008, ECF No. 78).  The Court declined to find Petitioner's eighteen (18) month delay as abusive and considered Petitioner's Amended Reply as a motion for leave to amend and granted leave to amend the Reply.  (Order, April 2, 2009, ECF No. 93).

limitations. *See* 28 U.S.C. § 2244(d)(1). The AEDPA provides four distinct triggering points for the one-year limitations period. Section 2244(d)(1)(A) specifies that the limitations period shall run from the date a judgment becomes final by the conclusion of direct review or the expiration of the time for seeking such review. Section 2244(d)(1)(B) specifies that the limitations period shall run from the date an impediment to filing created by the State is removed. Section 2244(d)(1)(C) specifies that the limitations period shall run from the date a constitutional right has been initially recognized by the United States Supreme Court and made retroactively applicable to cases on collateral review. Section 2244(d)(1)(D) specifies that the limitations period shall run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

Here the applicable section is 2244(d)(1)(A), however, as in this case where the judgment became final prior to the enactment of the AEDPA, the limitations period begins to run on April 24, 1996, the day the AEDPA was enacted. *See e.g., Baker v. Norris,* 321 F.3d 769, 771 (8th Cir. 2003). Section 2244(d)(2) also provides that the time during which a "properly filed application" for state post-conviction or other collateral review with respect to the pertinent judgment or claim is "pending" shall not be counted toward any period of limitations. 28 U.S.C. § 2244(d)(2).

### B.    Statute-of-Limitations Facts

Petitioner's conviction was final on October 7, 1991 when the United States Supreme Court denied certiorari. *See Coulter v. Arkansas*, 112 S.Ct. 102 (1991). *See also Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009) ("[T]he finality of a state-court judgment is expressly defined by statute as 'the conclusion of direct review or the expiration of the time for seeking such review.'") (quoting 28 U.S.C. § 2244(d)(1)(A)). On April 24, 1996, the day the AEDPA was enacted,

Petitioner's post-conviction proceedings were pending in Ashley County Circuit Court.  (Rule 37 Proceeding R. vols. 1-2, ECF No. 9, Exs. H-1, H-2).  The state post-conviction action was dismissed on October 8, 1999, and Petitioner filed a notice of appeal on January 27, 2000.  On February 22, 2000, Petitioner filed a Motion for Belated Appeal with the ARSC.  The ARSC granted this Motion on March 30, 2000.  *See Coulter v. State*, 340 Ark. 717, 13 S.W.3d 171 (Ark. 2000).  The ARSC affirmed the denial of Petitioner's post-conviction relief in an opinion dated November 30, 2000 and issued a mandate as to such on December 19, 2000.  *See Coulter v. State,* 343 Ark. 22  (2000).  Petitioner filed his original Petition for Writ of Habeas Corpus in this Court on October 1, 2001.  (Pet., ECF No. 3).

Because Petitioner's conviction became final prior to the enactment of the AEDPA his limitations period did not begin to run until April 24, 1996, the date the AEDPA was enacted.  *See Baker,*  321 F.3d at 771.  Further, because Petitioner's state post-conviction proceedings were pending in Ashley County Circuit Court on April 24, 1996, his limitations period was tolled until his post-conviction proceedings were no longer pending.  28 U.S.C. § 2244(d)(2); *see also Walker v. Norris*, 436 F.3d 1026, 1030 (8th Cir. 2006) (explaining that pursuant to section 2244(d)(2), the AEDPA limitations period is tolled during a "properly filed" application for State post-conviction relief).  The Court must now determine when Petitioner's post-conviction proceedings were no longer pending.

### C.    Parties' Statute-of-Limitations Arguments

Respondent argues that Petitioner's post-conviction proceedings ceased pending on October 8, 1999 when the Ashley County Circuit Court dismissed his post-conviction motion for relief.  Further, Respondent argues Petitioner's post-conviction proceedings did not resume pending until

the Supreme Court of Arkansas granted Petitioner permission to pursue a belated appeal of the denial of post-conviction relief on March 30, 2000.  Therefore, according to Respondent, the limitations period was not tolled from October 8, 1999 to March 30, 2000—a time period of over five months.  Respondent concedes that Petitioner's limitations period was tolled from March 30, 2000 (when the ARSC granted him permission to pursue a belated appeal) until December 19, 2000 (when the ARSC issued its mandate affirming the denial of State post-conviction relief).  Respondent argues that the limitations period began running again on December 19, 2000, and that a time period of approximately nine months elapsed before Petitioner filed his original Petition in this court on October 1, 2001.  Therefore, according to Respondent's calculations, Petitioner's limitations period ran for a total of fourteen (14) months—two months outside the one-year AEDPA statute of limitations—prior to October 1, 2001 when the original Petition was filed.

Petitioner argues that his original Petition is timely because his post-conviction proceedings did not cease "pending," for purposes of section 2244(d)(2), between the October 8, 1999 denial of post-conviction relief and the March 30, 2000 grant to pursue a belated appeal.  In the alternative, Petitioner argues that his limitations period did not begin to run until November 8, 1999 (the deadline for appealing the dismissal of his post-conviction proceedings) and was then tolled again on February 27, 2000[8] (the day Petitioner filed his Motion for Belated Appeal).  Therefore, according to Petitioner's calculations, in his alternative argument, only eighty (80) days elapsed prior to the ARSC issuing its mandate on December 19, 2000.

---

[8] Petitioner actually filed his Motion for Belated Appeal on February 22, 2000.  (Am. Resp., ECF No. 98, Ex. 1).

**D.     Analysis**

As stated above, section 2244(d)(2) tolls the AEDPA limitations period in certain instances.

Specifically, section 2244(d)(2) reads in pertinent part:

> The time during which a properly filed application for State post-conviction or
> other collateral review with respect to the pertinent judgment or claim is pending
> shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).  Therefore, the Court must determine at what times from April 24, 1996

to October 1, 2001 Petitioner's post-conviction proceedings were pending.

In *Carey v. Saffold*, 536 U.S. 214 (2002), the Supreme Court determined that an application

is "pending," as the term is used in section 2244(d)(2), "until the application has achieved final

resolution through the State's post-conviction procedures . . . ."  *Id.* at 220.  Further, the Supreme

Court has recognized that a State's post-conviction procedure is complete once the State's highest

court issues a mandate on the proceedings or denies review.  *See Lawrence v. Florida*, 549 U.S.

327, 332 (2007).  The Eighth Circuit Court of Appeals ("Eighth Circuit"), in applying *Carey,* held

that an application for state post-conviction review remains "pending" during the time in which

an appeal of the denial of the application may be filed, even if the appeal is not actually filed.  *See*

*Williams v. Bruton*, 299 F.3d 981, 983 (8th Cir. 2002).  The Eighth Circuit reasoned that the

application does not reach "final resolution" until the time for appeal has expired.  *Id.*

However, the Eighth Circuit does not consider an application for post-conviction relief  as

"'pending' between the expiration of the time for appeal and the filing of a petition for belated

appeal."  *Streu v. Dormire*, 557 F.3d 960, 966-67 (8th Cir. 2009).  In *Streu,* the Eighth Circuit

agreed with several other circuits that the grant of a motion for belated appeal in state court did

not retroactively toll a petitioner's section 2244(d)(2) limitations period.  *See Streu,* 557 F.3d at

966-967 (citing *McMillan v. Sec'y for Dep't of Corr.*, 257 Fed.Appx. 249, 252 (11th Cir. 2007) (per curiam); *Allen v. Mitchell,* 276 F.3d 183, 186 (4th Cir. 2001); *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001); *Gibson v. Klinger,* 232 F.3d 799, 807 (10th Cir. 2000); *Fernandez v. Sternes,* 227 F.3d 977, 979 (7th Cir. 2000)).

The facts of *Streu* are analogous to the facts presented here.  After properly seeking one round of state post-conviction relief,[9] Streu attempted a second application for post-conviction relief by filing a motion to reopen his state post-conviction proceedings on September 12, 2005. This motion was denied by the trial court, but Streu was not notified of this denial thereby causing him to miss his deadline for appealing the denial to reopen state post-conviction proceedings. After realizing what occurred, on March 3, 2006, Streu filed a motion for leave to file an appeal out of time with the state court of appeals.  On March 14, 2006, Streu's motion for leave was granted, and on March 31, 2006, Streu properly filed his appeal of the denial to reopen post-conviction proceedings.  *See Streu,* 557 F.3d at 962-63.

The Eighth Circuit conducted a thorough analysis of when precisely a  motion to appeal was "pending" for purposes of 2244(d)(2).  *Id.* at 965-66.  Applying the reasoning announced in *Carey* and *Williams,* the Eighth Circuit found Streu's proceedings were "pending" between March 14, 2006 (the date his motion for leave to file an untimely appeal was granted) and January 24, 2007 (the date the court of appeals issued its mandate affirming the denial of his motion to

---

[9] Streu's conviction became final, for purposes of the AEDPA's statute of limitations, on November 21, 2001 when the state court of appeals issued its mandate affirming the trial court's judgment.  The AEDPA's statute of limitations began running at this time.  On February 4, 2002, Streu filed a timely motion for post-conviction relief.  This motion tolled the AEDPA's limitations period until May 26, 2005 when the state court of appeals denied relief and issued its mandate.  *See Streu*, 557 F.3d at 962-63.

reopen).  *Streu*, 557 F.3d at 966.  The *Streu* court reasoned that once the deadline for filing a notice of appeal passed without any action by Streu, there was nothing "in continuance" or "not yet decided" and the post-conviction proceedings had reached a resolution.  *Streu,* 557 F.3d at 966 (quoting *Saffold,* 536 U.S. at 219.).  Further, the *Streu* Court held there was nothing "pending" after Streu failed to file his appeal until he filed his motion for leave to proceed out of time.  *Id.* at 967.  The *Streu* court concluded that the AEDPA's limitations period was not tolled between the time Streu's deadline to appeal expired and the filing of his motion for leave to file appeal out of time.  *Id.* at 967.

Accordingly, pursuant to *Streu,* the Court finds Petitioner's post-conviction proceedings ceased pending when his time to appeal expired on November 8, 1999[10] and was not again pending until he filed his motion for belated appeal on February 22, 2000.[11]  *Id.* at 967.

Petitioner argues that the state court of appeals, in granting his belated appeal, "reset" his AEDPA limitations period.  Petitioner relies on *Jimenez v. Quarterman*, 555 U.S. 113 (2009) in support of this argument.

In *Jimenez*, the Supreme Court issued a narrow holding that "where a state court grants a criminal defendant the right to file an out-of-time *direct appeal* during state collateral review, but before the defendant has first sought federal habeas relief, his judgment is not yet 'final' for

---

[10] Arkansas Rules of Appellate Procedure—Criminal, Rule 4(a), provides 30 days for an appeal of post-conviction rulings.

[11] The Court notes that the *Streu* opinion is unclear as to whether it is the motion for leave to appeal or the granting of such motion that reinstates the petitioner's post-conviction proceedings as "pending" for the purpose of section 2244(d)(2).  For purposes of this opinion, the Court assumes without deciding that Petitioner's motion for belated appeal reinstated the "pending" status of his post-conviction proceedings.

purposes of § 2244(d)(1)(A)." *Jimenez*, 555 U.S. at 686 (emphasis added).   The *Jimenez* Court specifically stated: "[t]he only disputed question before us is . . . the date on which direct review became "final" under the statue [28 U.S.C. § 2244(d)(1)(A)]."   *Id.* at 119.   The date on which direct review became final is not the issue  presented here.   In this case, it is undisputed that Petitioner's conviction became final at the conclusion of direct review on October 7, 1991 when the Supreme Court denied certiorari.   Further, when a conviction becomes final pursuant to section 2244(d)(1)(A) is a distinct issue from when an application for post-conviction review is "pending" pursuant to section 2244(d)(2).   *See Streu,* 557 F.3d at 967 n. 2.   Moreover, the Eighth Circuit specifically noted that *Jimenez* does not suggest "that once a motion for leave to file an untimely appeal is granted, an 'application for State post-conviction or other collateral review' should be deemed 'pending' from the time the motion for leave was filed until the belated appeal is resolved."   *Streu,* 557 F.3d at 967 n. 2.   In *Streu,* the Eighth Circuit goes on to explain that the *Jimenez* Court implied that "the appeal was not 'pending' during the period after the time for appeal had expired, but before leave to file an appeal out of time was granted."   *Id.*   Accordingly, the law does not support Petitioner's argument that granting his motion for belated appeal  "reset" his one-year AEDPA limitations period.

As explained above, the law supports Petitioner's alternative argument that his post-conviction proceedings were pending until the time expired for him to appeal the denial of his post-conviction proceedings and began pending again once he filed his motion for belated appeal. However, the dates and time calculations offered by Petitioner are incorrect, and even applying Petitioner's alternative calculations, the original Petition was filed outside the AEDPA one-year limitations period.

First, Petitioner asserts his time period began to run on November 8, 1999 (his deadline for appeal of the dismissal of his post-conviction proceedings expired). The limitations period, however, did not begin accruing until November 9, 1999 pursuant to Federal Rule of Civil Procedure 6(a)(1)(A) which excludes from the time computation the day of the event triggering the time period. *See Moore v. United States,* 173 F.3d 1131, 1133-35 (8th Cir. 1999) (applying Federal Rule of Civil Procedure 6(a) to AEDPA statutes of limitations).

Next, Petitioner claims that his limitations period was tolled again on February 27, 2000, the day Petitioner filed his Motion for Belated Appeal. However, Petitioner filed his Motion for Belated Appeal on February 22, 2000 not February 27, 2000. (Am. Resp., ECF No. 98, Ex. J).

Finally, Petitioner argues only eighty (80) days elapsed while his post-conviction proceedings were not pending (according to Petitioner, from November 8, 1999 to February 27, 2000). This computation excluded intermediate Saturdays, Sundays, and legal holidays. The 1999 version of Rule 6 provided for the exclusion of intermediate Saturdays, Sundays, and legal holidays "[w]hen the period of time prescribed or allowed is less than 11 days . . . ." *See Lomax v. Armontrout*, 923 F.2d 574, 575 (8th Cir. 1991). This exclusion did not apply, however, to time periods over eleven (11) days. *See Valley Engineers Inc. v. Electric Engineering Co.,* 158 F.3d 1051, 1058-9 (9th Cir. 1998) (holding, pursuant to Rule 6, intermediate weekend days were not excluded from periods over 10 days). Because the AEDPA limitations period is one year, intermediate Saturdays, Sundays, and legal holidays should be included when calculating the filing deadline. *See* Fed. R. Civ. P. 6; *Moore,* 173 F.3d at 1133-35.

For the reasons stated above, the Court finds Petitioner's one-year AEDPA limitations period began to run on November 9, 1999, the day after his deadline to appeal expired, and was

not tolled again until February 22, 2000 when Petitioner filed his Motion for Belated Appeal.  S*ee Streu*, 557 F.3d at 966; *Williams*, 299 F.3d at 983.  During this time period 106 days of Petitioner's limitations period elapsed.  Petitioner's limitations period began running again on December 20, 2000, the day after the ARSC issued its mandate affirming the denial of Petitioner's post-conviction relief.  *See Lawrence*, 549 U.S. at 332.  Petitioner filed his original Petition for Writ of Habeas Corpus in this Court on October 1, 2001.  (Pet., ECF No. 3).  During this time period 286 days elapsed.  Therefore, a total of 392 days elapsed, save for the tolled periods, from April 24, 1996 (the time Petitioner's AEDPA's one-year statute-of-limitations period began to run) and October 1, 2001 (the filing date of Petitioner's original Petition).  Accordingly, the Court finds Petitioner filed his original Petition twenty-seven (27) days outside his AEDPA one-year limitations period.

## III.   Equitable Tolling

Because the Court finds Petitioner's original Petition was untimely filed, it must now address Petitioner's alternative argument that he is entitled to equitable tolling.  Petitioner makes three distinct arguments for equitable tolling of his AEDPA limitations period: (1) the State erred in mailing the notice of judgment in his post-conviction proceedings; (2) his attorney abandoned him; and (3) his mental illness prevented him from protecting himself against the limitations period.[12]

### A.      Equitable Tolling Applicable Law

The Eighth Circuit and the United States Supreme Court recognize that section 2244(d) is

---

[12] Petitioner also argues the State's failure to oppose his belated appeal and delay in raising the issue in this Court favor equitable tolling.  Petitioner offers no authority to support these arguments therefore the Court is unconvinced by these unsupported arguments.

subject to equitable tolling in appropriate instances.  *See Holland v. Florida*, 560 U.S. 631 (2010); *see also Jihad v. Hvass*, 267 F.3d 803 (8th Cir. 2001).  Equitable tolling should only be afforded, however, if the petitioner can show: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland,* 560 U.S. at 649 (quoting *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)).  *See also Earl v. Fabian,* 556 F.3d 717 (8th Cir. 2009).

In *Holland,* the Supreme Court directed courts to rely upon the precedent set by similarly situated cases but cautioned against a "hard and fast adherence" to absolute legal rules in cases where such application may result in unnecessary rigidity.  *Holland*, 560 U.S. at 650 (internal quotations omitted).  Specifically, the *Holland* Court noted:

> [C]ourts of equity can and do draw upon decisions made in other similar cases for guidance.  Such courts exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case.

*Id.*  Therefore, the Court must, under the direction of *Holland,* draw upon case precedent provided while simultaneously determining whether this particular case presents special circumstances warranting special treatment in equity.  Petitioner bears the burden of  demonstrating grounds warranting equitable tolling.  *Earl*, 556 F.3d at 722 (citing *Pace v. Diguglielmo,* 544 U.S. 408, 418 (2005)).

In the Eighth Circuit, equitable tolling of the AEDPA's statute of limitations has traditionally been a narrow window of relief:

> Equitable tolling is proper only when extraordinary circumstance beyond a prisoner's control make it impossible to file a petition on time.  Further, equitable tolling may be appropriate when conduct of the defendant has lulled the plaintiff into inaction.

*Jihad,* 267 F.3d at 805 (quoting *Kreutzer v. Bowersox,* 231 F.3d 460, 463 (8th Cir. 2000)). Further, Eighth Circuit precedent is consistent in advising that the use of equitable tolling should be "guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Earl*, 556 F.3d at 722 (citing *Flanders v. Graves,* 299 F.3d 974, 976 (8th Cir. 2002)). *See also Jihad*, 267 F.3d at 806.

### B.    Equitable Tolling Facts

As noted above, Petitioner's AEDPA limitations period was tolled while his post-conviction proceedings were properly pending in state court—April 24, 1996 through November 8, 1999 and February 22, 2000 through December 20, 2000.

During the time his post-conviction proceedings were pending in Ashley County, Petitioner was represented by Alvin Schay who ran the Arkansas Resource Center ("Resource Center").  Even though the Resource Center shut down in March 1996, Mr. Schay remained Petitioner's counsel. (Habeas Hearing Tr., 359-360).  After the Resource Center shut down, Mr. Schay moved offices and informed the Ashley County Circuit Court Clerk ("Circuit Court Clerk") of his change of address on two separate occasions. These notifications indicated Mr. Schay's address, as attorney of record for Petitioner, should be changed from the Resource Center, 1500 Riverfront Drive, Ste. 118, Little Rock, Arkansas to 217 West Second Street, 110-A, Little Rock, Arkansas.  (Pet'r's Hearing Ex. 35, 37).[13]

On October 8, 1999, Petitioner's petition for post-conviction relief was denied by the Circuit Court.  (Pet'r's Hearing Ex. 56); *see also Coulter v. State*, 340 Ark. 717, 13 S.W.3d 171

---

[13] All cites to Hearing Exhibits are references to exhibits admitted at the Habeas Hearing unless specifically noted otherwise.

(2000). The Circuit Court Clerk subsequently mailed the judgment to the Arkansas Resource Center address which, by that time, no longer existed. The judgment was returned to the Circuit Court Clerk marked "undeliverable as addressed-forwarding order expired" on October 21, 1999. (Pet'r's Hearing Ex. 44). There is no indication in the state court record that the Circuit Court Clerk made any further attempts to send the judgment to Petitioner or his counsel at the West Second Street address or any other address.

There was evidence presented at the Habeas Hearing that Mr. Schay's office was no longer located at the West Second Street address on October 8, 1999 when the post-conviction judgment was mailed. By October 1999, Mr. Schay had moved again to Spring Street in Little Rock, Arkansas. Mr. Schay did not inform the Circuit Court Clerk of this change of address, however, Mr. Schay was having his mail forwarded from the West Second Street address to his Spring Street address in October of 1999. (Habeas Hearing Tr., 363).

On January 25, 2000, an assistant attorney general called Mr. Schay and informed him Petitioner's post-conviction relief was denied on October 8, 1999. (Pet'r's Hearing Ex. 43). That same day, January 25, 2000, Mr. Schay filed a notice of appeal with the ARSC and requested records from the Circuit Court Clerk regarding how they attempted to send him the notice of the judgment. (Pet'r's Hearing Exs. 43, 45). Mr. Schay then filed a Motion for Belated Appeal with the ARSC on February 22, 2000. (Pet'r's Hearing Ex. 39). The ARSC granted the Motion confirming that the notice of judgment was mailed to an incorrect address and that Mr. Schay, as counsel for Petitioner, did not receive notice of the judgment until January 25, 2000. (Pet'r's Hearing Ex. 48); s*ee also Coulter v. State*, 340 Ark. 717, 13 S.W.3d 171 (Ark. 2000).

Petitioner's appeal was subsequently denied and Mr. Schay, along with Craig Lambert, filed

23

Petitioner's original Petition in this Court on October 1, 2001.  (Pet., ECF No. 3).  Additionally, Mr. Schay, Mr. Lambert, and Jenniffer Horan, Federal Public Defender, filed Petitioner's first Amended Petition on September 16, 2003 (Am. Pet., ECF No. 25), and Mr. Schay, Mr. Lambert, and Julie Brain, Federal Public Defender, filed his second Amended Petition on January 3, 2007 (Am. Pet., ECF No. 44).  Craig Lambert, Jeniffer Horan, and Julie Brain remain attorneys of record for Petitioner.  Mr. Schay remained an attorney of record in this matter until February 10, 2009 when his Motion to Relieve Counsel of Record was granted by the Court.  (Order, February 10, 2009, ECF No. 88).  In his Motion, Mr. Schay explained to the Court that he requested to withdraw his representation of Petitioner based on his co-counsel's assertion in the Second Amended Petition that Mr. Schay had provided ineffective assistance to Petitioner during post-conviction proceedings.  (Mot. to Relieve Counsel of Record, January 13, 2009, ECF No. 84).

### C.      Parties' Equitable Tolling Arguments

Petitioner makes multiple arguments in support of his contention that  his AEDPA statute of limitations should be equitably tolled.  First, Petitioner argues that the State created a delay which unnecessarily triggered his AEDPA limitations period.  Second, Petitioner claims he is entitled to equitable tolling because his post-conviction counsel abandoned him.  Finally, Petitioner argues his mental illness entitles him to equitable tolling.

Respondent argues that Petitioner, regardless of the Ashley County Clerk's failure to mail the notice to the correct address, failed to demonstrate that any extraordinary circumstance beyond his control made it impossible to calculate the correct filing deadline for his habeas petition or that the State prevented him from taking more timely action after the ARSC affirmed the denial of his post-conviction proceedings and issued its mandate in December 2000.  Further, Respondent argues

mere attorney error does not warrant equitable tolling and only egregious attorney misconduct will equitably toll the statute of limitations.   Respondent did not directly respond to Petitioner's argument that his mental capacity entitles him to equitable tolling.

### D.   Analysis

#### 1.  State Created Delay

In conducting an equitable tolling analysis, the Court must first determine whether Petitioner has shown any extraordinary circumstances, beyond his control, that prevented a timely filing of his habeas petition in this Court.  *See Holland,* 560 U.S. at 649; s*ee also Earl,* 556 F.3d at 722.

Petitioner argues that the Circuit Court Clerk's failure to mail his post-conviction notice of judgment to the correct address and additional failure to attempt to notify Petitioner once the notice was returned as undeliverable prevented him from timely filing his appeal of the denial of his post-conviction proceedings.  Further, Petitioner's failure to file a timely appeal of the post-conviction judgment unnecessarily triggered Petitioner's AEDPA limitations period.  According to Petitioner, but for the Circuit Court Clerk's error in mailing the notice to the incorrect address, he would have filed a timely appeal and his AEDPA limitations period would have remained tolled, thus, rendering his habeas petition in this Court timely.

Based on the evidence before the Court, it is clear that the Circuit Court Clerk mailing error delayed Petitioner's notice of the judgment in his post-conviction proceedings by over three months.  (Pet'r's Hearing Ex. 43, 56).  This error prevented Petitioner from filing a timely appeal

of his state post-conviction proceedings.[14]   *See Coulter v. State*, 340 Ark. 717, 13 S.W.3d 171

(2000).

In *Earl v. Fabian,* the Eighth Circuit found a state's failure or delay in mailing a judgment

may serve as an extraordinary circumstance in order to equitably toll the AEDPA's one-year statute

of limitations.  556 F.3d at 723.  In *Earl*, the Minnesota Department of Corrections ("MDC")

transferred Earl to an undisclosed out-of-state facility during the pendency of his direct appeal.

The MDC refused to provide Earl's counsel with his location forcing counsel to rely upon the

MDC to forward all correspondence to Earl.  During this time, Earl's direct appeal was decided

and his judgment became final.  Counsel wrote to Earl to inform him of this fact but counsel was

dependent on the MDC to forward this correspondence to Earl.  Earl claims he did not receive the

correspondence from his counsel notifying him his direct appeal was final for seven months.  *Id.*

at 719-20.  The Eighth Circuit held this type of delay qualifies as an extraordinary circumstance

sufficient to equitably toll the AEDPA limitations period.  *Id.* at 723-24.  Specifically the *Earl*

court held: "a significant state created delay in providing a prisoner with notice that his state

judgment of conviction has become final amounts to an extraordinary circumstance beyond a

prisoner's control which can equitably toll the AEDPA statute of limitations if the petitioner has

---

[14] The Court is unconvinced by Respondent's argument that the error of not sending the notice to the West Second Street address was inconsequential because Mr. Schay's office was located on Spring Street at the time of mailing and would not have been received regardless if sent to the West Second Street address.  It was shown at the Habeas Hearing that any mail sent to Mr. Schay at the West Second Street address in October 1999 would have been forwarded by the U.S. Postal Service to Mr. Schay's new office on Spring Street. (Habeas Hearing Tr., 363).  Accordingly, had the Circuit Court Clerk sent the notice of judgment to Mr. Schay's address of record at West Second Street, Mr. Schay would have received it at his Spring Street address.

pursued his rights with diligence." *Id.* at 723-24.[15]

The delay in *Earl* is analogous to the delay presented here. Accordingly, the Court finds that the Circuit Court Clerk's failure to send Petitioner's notice to the proper address constitutes an extraordinary delay beyond Petitioner's control.

Having found Petitioner was faced with at least one extraordinary circumstance beyond his control—the state created delay—the Court must now determine if Petitioner has shown he was pursuing his rights diligently. *See Holland,* 560 U.S. at 649; s*ee also Earl,* 556 F.3d at 722.

Petitioner argues his counsel's quick response when he learned the Circuit Court Clerk failed to notify him of the Circuit Court's judgment on his post-conviction proceedings shows diligence to satisfy the equitable tolling requirements. Respondent argues that Petitioner failed to pursue his rights diligently in the eight months remaining in his one-year limitations period after the ARSC affirmed the denial of his post-conviction relief.

As stated above, the Circuit Court Clerk's failure to provide notice of judgment caused Petitioner to belatedly file his appeal of that judgment in state court, thus, unnecessarily triggering Petitioner's AEDPA limitations period to run from the expiration of his appeal deadline until he filed his Motion for Belated Appeal—a period of 106 days. The record also indicates that a total of 286 days elapsed between December 19, 2000 (when the ARSC issued its Mandate confirming

---

[15] The Eighth Circuit noted that its decision in *Earl* is in line with many other circuits that have addressed this issue. *See Earl,* 556 F.3d at 723 (citing *Diaz v. Kelly,* 515 F.3d 149, 155 (2d Cir. 2008), *cert. denied,* 555 U.S. 870, 129 S.Ct. 168, 172 L.Ed.2d 121 (2008); *Jenkins v. Johnson,* 330 F.3d 1146, 1155 (9th Cir. 2003); *Miller v. Collins,* 305 F.3d 491, 495–96 (6th Cir. 2002); *Knight v. Schofield*, 292 F.3d 709, 711 (11th Cir. 2002) (per curiam); *Woodward v. Williams,* 263 F.3d 1135, 1142–43 (10th Cir. 2001); *Phillips v. Donnelly,* 216 F.3d 508, 510–11 (5th Cir. 2000) (per curiam)). District courts have also reached the same conclusion. *See, e.g., United States ex rel. Willhite v. Walls,* 241 F.Supp.2d 882, 888 (N.D.Ill. 2003); *Brandon v. United States,* 89 F.Supp.2d 731, 734 (E.D.Va. 2000).

the denial of Petitioner's post-conviction relief) and October 1, 2001 (when Petitioner filed his original Petition in this Court).  These two accrual periods total 392 days.  Thus, Petitioner filed his original Petition 27 days outside of the AEDPA one year statute of limitations.  While Petitioner argues the diligence of Mr. Schay exhibited in state court in early 2000, he has not cited to any evidence regarding how Petitioner or his counsel diligently pursued his rights during the 286 days that elapsed between December 19, 2000 and October 1, 2001.  Without evidence showing Petitioner or his counsel exercised diligence during this 286-day time period, the Court cannot find Petitioner has made the requisite diligence showing to warrant equitable tolling.

In *Earl,* the Eighth Circuit found that even though the petitioner suffered an extraordinary circumstance beyond his control (the state caused delay), he was not entitled to equitable tolling because he did not pursue his rights diligently.  *Earl,* 556 F.3d at 724.  The *Earl* court explained that, even though, the state caused a delay in petitioner receiving notice that his conviction was final, once he received that notice in March 2006, he still had approximately eight months[16] to timely file his habeas petition.  The *Earl* court found the petitioner's delay in filing after he received notice disqualified him for equitable tolling because Earl failed to pursue his rights diligently once he received notice of the state created delay.  *Id.*

The Court notes that *Earl* was decided prior to *Holland v. Florida,* 560 U.S. 631 (2010), and the Supreme Court in *Holland* noted the equitable tolling diligence requirement is one of "reasonable diligence not maximum feasible diligence."  *Holland*, 560 U.S. at 653.  Additionally, the *Holland* Court cautioned against a "hard and fast adherence" to absolute legal rules in cases

---

[16]Earl's AEDPA one-year limitations period began running on November 30, 2005 when the period to file a petition for writ of certiorari with the Supreme Court expired.  Therefore, without tolling, Earl's limitations period expired on November 30, 2006.

where such application may result in unnecessary rigidity unable to address certain injustices.  *Id.* at 650.  However, the *Holland* Court also instructed lower courts to "draw upon decisions made in other similar cases for guidance" and exercise judgment "in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case."  *Id.*

This Court has conducted an examination of the Eighth Circuit precedent post-*Holland* that presents similar facts as those presented here.  The position stated in *Earl* remains applicable: a petitioner fails to show the requisite diligence for equitable tolling if he unexplainedly waits to file his habeas petition after an exceptional circumstance is remedied.  *See e.g., Nelson v. Norris*, 618 F.3d 886 (8th Cir. 2010) (petitioner failed to pursue his rights diligently because he waited nine months after the ARSC denied his rehearing to file a habeas petition).  The relevant facts presented here are analogous to both *Earl* and *Nelson*, and Petitioner has failed to distinguish either of these cases.[17]

Petitioner has failed to show he diligently pursued his rights, or that his situation presents special circumstances that warrant equitable consideration under *Holland.*  Accordingly, the Court finds Petitioner is not entitled to equitable tolling of his AEDPA one-year statute of limitations based on the Circuit Court Clerk's mailing errors.  *See Holland,* 560 U.S. at 649; *Earl,* 556 F.3d at 722; *Nelson*, 618 F.3d at 886.

---

[17]Petitioner cites to multiple cases from outside the Eighth Circuit in support of his position, however, the majority of these cases also require diligence for equitable tolling and are cited by the Eighth Circuit in *Earl*.  *See Earl,* 556 F.3d at 723 (citing *Diaz v. Kelly,* 515 F.3d 149, 155 (2d Cir. 2008); *Jenkins v. Johnson,* 330 F.3d 1146, 1155 (9th Cir. 2003); *Miller v. Collins,* 305 F.3d 491, 495-96 (6th Cir. 2002); *Knight v. Schofield,* 292 F.3d 709, 711 (11th Cir. 2002); *Woodward v. Williams*, 263 F.3d 1135, 1142-43 (10th Cir. 2001); *Phillips v. Donnelly,* 216 F.3d 508, 511 (5th Cir. 2000)).

### 2. Post-Conviction Counsel

Petitioner also argues he is entitled to equitable tolling because his attorney, Mr. Schay, "virtually abandoned" him during Petitioner's state post-conviction proceedings. Petitioner cites to the following recent United States Supreme Court cases in support of his argument: *Trevino v. Thaler,* __ U.S. __, 133 S.Ct. 1911 (2013); *Martinez v. Ryan,* __ U.S. __, 132 S.Ct. 1309 (2012); *Maples v. Thomas,* __ U.S. __, 132 S.Ct. 912 (2012); and *Holland v. Florida,* 560 U.S. 631 (2010). Petitioner argues these cases caution this Court to consider in equity how Petitioner was harmed by Mr. Schay's actions when applying section 2244(d)(1) to this case.[18]  In response, Respondent argues that mere attorney error does not satisfy the equitable tolling extreme circumstance requirement.

As discussed above, the record indicates that during Petitioner's post-conviction proceedings in state court, Mr. Schay notified the Circuit Court of his address change but such address change was not noted in the Circuit Court records. This caused the post-conviction judgment to be returned undeliverable. Once Mr. Schay received notice from the Attorney General's office regarding the judgment, he immediately filed a notice of belated appeal and saw Petitioner's appeal through to its conclusion on December 19, 2000. Mr. Schay then filed Petitioner's original Petition in this matter on October 1, 2001. Petitioner did not cite to any evidence showing the Court what actions Petitioner or Mr. Schay took from December 19, 2000

---

[18] The Court is unconvinced by Petitioner's reliance on  *Trevino v. Thaler,* 133 S.Ct. 1911 (2013)*;* and *Martinez v. Ryan,* 132 S.Ct. 1309 (*2012) in support of this abandonment claim. These cases do not address the equitable tolling issues present here. *See Trevino,* 133 S.Ct. 1911; *Martinez,* 132 S.Ct. 1309. *Maples* and *Holland,* however, are instructive here.

until October 1, 2001— the filing date of this habeas Petition.[19]

However, at the Habeas Hearing, the Court heard testimony regarding the actions and omissions of Mr. Schay during Petitioner's post-conviction proceedings.  Mr. Schay sent Petitioner a letter when the Resource Center closed in March 1996 to let Petitioner know he would continue to represent him.  (Habeas Hearing Tr., 360).  Mr. Schay hired an investigator, psychologist, and neurologist to evaluate Petitioner.  (Habeas Hearing Tr., 372-3).  Mr. Schay deposed Petitioner's trial counsel.  (Habeas Hearing Tr., 401).  Further, Mr. Schay's investigator interviewed and obtained affidavits from at least some of Petitioner's siblings and obtained Petitioner's records from his incarceration in Arizona which showed he was treated for schizophrenia.  (Habeas Hearing Tr., 377).  Mr. Schay did not remember contacting or interviewing anyone related to Petitioner's case personally or obtaining social history records on Petitioner's family.[20]  (Habeas Hearing Tr., 387-90).  Further, Mr. Schay did not request any funds from the state court for a period of approximately three years—from 1996 to 1999.  (Habeas Hearing Tr., 383).

Finally, Mr. Schay filed Petitioner's original and first amended Petitions in this proceeding and remained an attorney of record until February 10, 2009 when his Motion to Relieve Counsel of Record was granted by the Court.  (Order, ECF No. 88).

As previously noted, in order to warrant equitable tolling, Petitioner must show: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in

---

[19] The Court notes that it is unclear from the Habeas Hearing testimony whether Mr. Schay's actions, enumerated here, took place before or after December 19, 2000 when the ARSC issued its mandate.

[20] The Court notes that Mr. Schay had trouble independently recalling many of the details of his representation of Petitioner.  He even testified "I'm sure there are a lot of things I can't remember, I'm 76." (Habeas Hearing Tr., 406).

his way' and prevented timely filing." *Holland,* 560 U.S. at 649.  Petitioner argues that Mr. Schay's actions in "virtually abandoning" him during post-conviction proceedings serve as an extraordinary circumstance.

"An attorney's negligence or mistake is not generally an extraordinary circumstance, however 'serious attorney misconduct, as opposed to mere negligence, may warrant equitable tolling.'" *Muhammad v. U.S.*, 735 F.3d 812, 816 (8th Cir. 2013) (quoting *U.S. v. Martin,* 408 F.3d 1089, 1093 (8th Cir. 2005)).  In *Holland* the United States Supreme Court remanded to the lower court for an extraordinary circumstances determination when the facts presented suggested such circumstances existed:

> To be sure, Collins failed to file Holland's petition on time and appears to have been unaware of the date on which the limitations period expired—two facts that, alone, might suggest simple negligence. But, in these circumstances, the record facts we have elucidated suggest that the failure amounted to more: Here, Collins failed to file Holland's federal petition on time despite Holland's many letters that repeatedly emphasized the importance of his doing so. Collins apparently did not do the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rules. Collins failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite Holland's many pleas for that information. And Collins failed to communicate with his client over a period of years, despite various pleas from Holland that Collins respond to his letters.

*Holland*, 560 U.S. at 652.

Similarly, the Eighth Circuit has found extraordinary circumstances based on attorney misconduct when the attorney conduct was egregious:

> In sum, [counsel] consistently lied to [the petitioner] and his wife about the filing deadline; repeatedly lied to [the petitioner] and his wife about the status of [his] case; refused to communicate with [the petitioner] or his wife; neglected to file any documents, belated or not, on [the petitioner's] behalf; and failed to return any of [the petitioner's] paperwork to him despite repeated requests and then demands.

> Such conduct presents the type of egregious attorney misconduct that may excuse an untimely filing.

*United States v. Martin*, 408 F.3d 1089, 1095 (8th Cir. 2005).[21]

While Petitioner has cited to facts showing Mr. Schay's somewhat detached approach to Petitioner's post-conviction proceedings,  Petitioner has not presented facts here analogous to those in *Holland* or *Martin*.  There is no indication that Mr. Schay ignored Petitioner, lied to Petitioner, or abandoned Petitioner.  To the contrary, the evidence shows Mr. Schay not only promptly rectified the failure-to-notice situation created by the Ashley County Circuit Clerk, he also filed Petitioner's original Petition in this matter and his First Amended Petition.  Mr. Schay also remained counsel of record in this matter until Petitioner amended his Petition a second time to assert an ineffective assistance of counsel claim against Mr. Schay.  The facts cited by Petitioner simply do not support a claim of abandonment.

Furthermore, as previously discussed, Petitioner has failed to cite any evidence that he acted diligently in pursuing his federal habeas relief.  *See Muhammad*, 735 F.3d at 816.  While the diligence required by *Holland* is reasonable diligence, not maximum feasible diligence, Petitioner failed to cite the Court any instances of how he diligently pursued his rights during his state post-conviction proceedings or the instant habeas petition.  In *Holland* and *Martin* the petitioner was found to have diligently pursued his rights despite his attorney's egregious conduct.  For example, Holland wrote his attorney many letters expressing his concerns regarding his AEDPA limitations period, *Holland,* 560 U.S. at 652; and Martin called and wrote his attorney inquiring about a

---

[21] While the *Martin* decision is one dealing with 28 U.S.C. § 2255 rather than § 2254 as at issue here, sections 2254 and 2255 "have the same operative language and the same purpose."  *U.S. v. Martin,* 408 F.3d 1089, 1092 (8th Cir. 2005).

deadline for filing his federal habeas petition and also had his wife call and meet with his attorney in an effort to proceed with his federal habeas petition, *Martin*, 408 F.3d at 1095.  In contrast, Petitioner failed to cite to any instance where he contacted Mr. Schay to inquire about his state post-conviction proceedings or the instant habeas proceedings.  Most importantly, Petitioner did not cite to any evidence showing he took any actions during the approximate eight months remaining in his limitations period after the ARSC affirmed his post-conviction denial on December 19, 2000.

Finally, in the event Petitioner intended his argument to be one regarding Mr. Schay's ineffective assistance in calculating the correct limitations period, the Court notes that an attorney's miscalculation of a filing deadline is not an extraordinary circumstance warranting equitable tolling.  *See Holland,* 560 U.S. at 651-52 ("We have previously held that a garden variety claim of excusable neglect, . . . such as a simple miscalculation that leads a lawyer to miss a filing deadline, . . . does not warrant equitable tolling . . . [absent additional facts of] far more serious instances of attorney misconduct.").  *See also Rues v. Denney*, 643 F.3d 618, 621-22 (8th Cir. 2011) (noting that the United States Supreme Court has reaffirmed the principle that a simple miscalculation error by an attorney does not warrant equitable tolling in both *Lawrence v. Florida*, 549 U.S. 327 and *Holland v. Florida*, 560 U.S. 631).

Again, Petitioner has failed to show he diligently pursued his rights, or that his situation presents special circumstances that warrant equitable consideration under *Holland.*  Accordingly, based on the evidence cited and the similar precedent in this Circuit, the Court finds Petitioner is not entitled to equitable tolling of his AEDPA one-year statute of limitations for the purported abandonment by his post-conviction counsel.

### 3.    Mental Health

Lastly, Petitioner argues that his mental illness prevented him from comprehending and protecting himself against the AEDPA's statute of limitations.  Petitioner failed to cite any Eighth Circuit or United States Supreme Court precedent in support of this argument.   Furthermore, Petitioner has not cited to any evidence showing he was incompetent or suffering from any mental impairment during the time period relevant to the AEDPA limitations period.  To the contrary, as the Court details below, Petitioner's mental health records from the ADC show he discontinued all anti-psychotic medications in February 1996, by his own request, and he has not required any mental health treatment since that date.  (Pet'r's Hearing Ex. 1C).  Petitioner has not cited to any further evidence of his mental health status during the relevant time period here.   Therefore, Petitioner has failed to show that his purported mental incompetence prevented him from protecting himself against the AEDPA's statue of limitations during the time periods relevant to Petitioner's limitations arguments—1999 to 2001.  Accordingly, the Court finds Petitioner is not entitled to equitable tolling of his AEDPA one-year statute of limitation based on his mental health.

## IV.    Miscarriage of Justice

Lastly, Petitioner argues the AEDPA time bar may not be invoked to stop habeas courts from remedying a miscarriage of justice.  Specifically, Petitioner claims he is actually innocent of capital murder and of the sentence of death, therefore, it would be a miscarriage of justice not to consider the merits of his habeas claims.  In support of his actual innocence claims, Petitioner presented voluminous records at the Habeas Hearing including medical and mental health records, social history records, and testimony from a mental health expert and his sister.

35

## A.      Applicable Law

As an initial matter the Court notes that neither of Petitioner's actual innocence claims are the "prototypical example of 'actual innocence' . . . where the State has convicted the wrong person of the crime." *Jones v. Delo,* 56 F.3d 848, 883 (8th Cir. 1995) (quoting *Sawyer v. Whitley,* 505 U.S. 333, 340, (1992)).  Instead, Petitioner's first claim that he is actually innocent of capital murder is a claim of the State having the "right" person but that "he is not guilty of the crime with which he is charged."[22]  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 322 (1995)).  Petitioner claims he was unable, due to mental illness, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct, thus, he should not have been held criminally responsible for his actions.  Additionally, Petitioner claims he was unable to act deliberately in order to meet the "manifesting extreme indifference to the value of human life" element of the capital murder statute.  Thus, he was incapable of satisfying an essential element of the Arkansas capital murder statute.  If either of these contentions are proven, Petitioner will meet the definition of actual innocence.  *Jones,* 56 F.3d at 883 (citing *Nave v. Delo*, 22 F.3d 802, 810 (8th Cir. 1994)).  Petitioner's second actual innocence claim is that he is innocent of the death penalty under Arkansas law because he was incapable of satisfying the aggravating factor found by the jury—that he murdered Natasha Phelps for the purpose of avoiding or preventing an arrest or effecting an escape from custody.  If proven, Petitioner will have satisfied the definition of innocent of the sentence of death.  *See Sawyer v. Whitley,* 505 U.S. 333 (1992).

The United States Supreme Court recently held a miscarriage of justice exception exists to

---

[22] The Court notes that there is no confession by Petitioner on the record, but Petitioner does not assert any claims here that he is not responsible for Natasha Phelps' death.

the AEDPA's one-year statute of limitations.  Specifically, a claim of actual innocence, if proven, may serve as a gateway, in which a petitioner may pass to the merits of his habeas claim even though his AEDPA statute of limitations has expired.  *See McQuiggin v. Perkins,* __ U.S. __, 133 S.Ct. 1924 (2013) (petitioner filed an untimely first federal habeas petition alleging a gateway actual innocence claim supported by three affidavits purporting to show petitioner did not commit the murder for which he was convicted).  The *McQuiggin* Court explained that the actual innocence gateway of  *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell*, 547 U.S. 518 (2006) now apply not only to procedural bars but also the AEDPA time bars.  *See McQuiggin*, 133 S.Ct. at 1928.  Further, the *McQuiggin* Court cautioned that "tenable actual-innocence gateway pleas are rare. . . ."  *McQuiggin*, 133 S.Ct. at 1928.

In *Schlup*, the United States Supreme Court discussed the standards of proof for both types of actual innocence claims asserted by Petitioner.  *Schlup*, 513 U.S. 298.  First, the *Schlup* Court discussed the standard set forth in  *Sawyer v. Whitley*, 505 U.S. 333 (1992) in analyzing an actually innocent of the death penalty claim.  *See Schlup*, 513 U.S. at 323.  When a petitioner claims he is actually innocent of the sentence of death he must "show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty."  *Id.* (quoting *Sawyer,* 505 U.S. at 336.) ("*Sawyer* Standard").  The *Schlup* Court went on to determine that, while the *Sawyer* Standard remained the standard of proof for actually innocent of the death penalty claims, it did not apply to claims in which the petitioner claims he is not guilty of the crime for which he is convicted.  *Id.* at 323-4.  Instead, a habeas petitioner claiming he is innocent of the crime must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . [by showing] it is more likely than

not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327 ("*Schlup* Standard").

Therefore, the *Schlup* Standard of proof applies to Petitioner's first actual innocence claim and he must show it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Schlup*, 513 U.S. at 327. Further, the *Sawyer* Standard applies to Petitioner's second claim that he is actually innocent of the death penalty, and he must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found him eligible for the death penalty. *Id.* (citing *Sawyer*, 505 U.S. at 336).

The *Schlup* Court enumerated the elements of a credible actual innocence claim: "such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. The *Schlup* Court recognized the rarity of a successful actual innocence gateway claim. The Court noted that the evidence required to support an actual innocence claim is "obviously unavailable in the vast majority of cases" and "claims of actual innocence are rarely successful." *Id.*

In *House,* the United States Supreme Court reiterated that a petitioner must present new reliable evidence that was not presented at trial in support of an actual innocence gateway claim. *House v. Bell*, 547 U.S. 518, 537 (2006). Additionally, the *House* Court emphasized that the habeas court, in conducting this gateway analysis, was to consider all of the evidence, "new and old, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* at 537-8. Finally, the *House* Court reiterated the rarity at which an actual innocence gateway claim will be successful. *Id.*

Accordingly, a petitioner who raises an actual innocence gateway claim, such as Petitioner's actual innocence claims here, must satisfy the two-part test set forth in *Schulp* before a habeas court can substantively review any otherwise procedurally or time barred claims.  *See McQuiggin,* 133 S.Ct. at 1928*; see also Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001) (citing *Schlup,* 513 U.S. at 327-28).   First, the habeas court must determine whether the petitioner's allegations of constitutional error are supported by "new reliable evidence not available at trial." *Amrine*, 238 F.3d at 1029 (citing *Schlup,* 513 U.S. at 327-8).  If his constitutional allegations are supported by "new and reliable evidence not available at trial," the Court will then proceed to a determination on whether the jury would have convicted or sentenced Petitioner to death in light of the new evidence.  *Id.  See also Nave v. Delo*, 62 F.3d 1024, 1033 (8th Cir. 1995) ("the Sawyer actual innocence standard[] must be applied in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.") (quoting *Schlup*, 513 U.S. 328).

## B.    Relevant Trial and Conviction Facts

The state record indicates that in October 1989, Petitioner was convicted of "capital felony murder on the basis that he killed Natasha Phelps during the course of and in furtherance of raping her, under circumstances manifesting extreme indifference to the value of human life." *Coulter v. State,* 343 Ark. 22, 31 S.W.3d 826, 833 (Ark. 2000) (citing Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997)

In 1989, at the time of Petitioner's conviction, Arkansas Code Annotated section 5-10-101(a)(1) read in pertinent part:

> (a) A person commits capital murder if: (1) Acting alone or with one (1) or more other persons, he commits or attempts to commit . . . [rape] . . . and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life . . . .

*Sellers v. State,* 300 Ark. 280, 282, 778 S.W.2d 603, 605 (Ark. 1989).  The language "manifesting extreme indifference to human life" has been interpreted by the ARSC to require deliberate conduct that culminates in the death of a person.  *See Davis v. State,* 325 Ark. 96, 104, 925 S.W.2d 768, 773 (Ark. 1996).

Further, during the penalty phase "the jury found the aggravating circumstance that the capital murder was committed for the purpose of avoiding or preventing arrest . . . [pursuant to] Ark. Code Ann § 5-4-604(5) (Repl. 1997)."  *Coulter v. State,* 343 Ark. 22, 34, 31 S.W.3d 826, 833 (Ark. 2000).

At trial, during the penalty phase, Lavern Temple, Petitioner's mother, Dr. William Martin, a clinical psychologist hired by Petitioner's trial counsel, and Dr. Michael Simon, the Arkansas State Hospital forensic psychologist, all testified.  (Trial Ct. Tr., vol. 7)

### C.    Parties' Arguments

Petitioner argues that he is actually innocent of capital murder and also actually innocent of the death penalty.  He maintains that this entitles him to consideration of his habeas claims on their merits despite any procedural or time bars.[23]  Petitioner presents two distinct actual innocence

---

[23] It is noted that Petitioner's actual innocence claims are not substantive innocence claims as made in *Herrera v. Collins,* 506 U.S. 390 (1993) (the petitioner alleged he was innocent in support of a substantive constitutional claim as the execution of an innocent person would violate the Eighth Amendment).  Instead, Petitioner seeks to use his actual innocence claim as a gateway to overcome the procedural bars and limitations arguments asserted by Respondent in order to reach Petitioner's thirteen substantive constitutional violation claims made in his Second Amended Petition.

arguments. First, he argues he is actually innocent of the capital murder of Natasha Phelps; and second, he argues he is actually innocent of the sentence of death. Specifically, Petitioner claims he is innocent of capital murder as defined by Arkansas law because, at the time of the crime: (1) he was unable, due to mental illness, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct; (2) he was unable to act deliberately, as required for the "manifesting extreme indifference to the value of human life" element of the capital murder statute; (3) no aggravating circumstance exists to support his sentence of death; and (4) the mitigating evidence overwhelmingly outweighs any aggravating circumstances so that no juror would have sentenced Petitioner to death had they heard such mitigation evidence.

Respondent argues Petitioner is not entitled to the miscarriage of justice exception because he has not shown he is actually innocent of capital murder due to mental illness. According to Respondent, Petitioner has produced no evidence demonstrating he suffered from mental illness at the time of the crime and during any of the subsequent legal proceedings. Further, Respondent argues Petitioner's argument that he is innocent of the death penalty does not overcome an expired statute of limitations. Alternatively, Respondent argues even if being innocent of the death sentence could overcome the expired statute of limitations, Petitioner has failed to show he is innocent of his sentence to death.

### D.    Analysis

The Court must first determine if any of the evidence proffered at the Habeas Hearing is new evidence, thus, necessitating consideration. Once the Court determines what evidence it must consider, the Court will then determine whether such evidence shows Petitioner is actually innocent of capital murder under the *Schlup* Standard and whether he is innocent of the sentence of death

under the *Sawyer* Standard.   Finally, as an alternative analysis, the Court will consider whether Petitioner could have shown actual innocence if all of the evidence before the Court were considered by a jury.  *See House v. Bell*, 547 U.S. 518, 537-38 (2006) (habeas court, in conducting a gateway analysis, is to consider  all of the evidence, "new and old, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial").

### 1.    New Evidence

The first consideration the Court must undertake is whether Petitioner has presented new and reliable evidence to support his claims that he was unable, due to mental illness, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct, and that he was unable to act deliberately, as required for the manifesting extreme indifference to the value of human life element of the Arkansas capital murder statute.

In *Amrine*, the Eighth Circuit defined "new evidence," as used in *Schulp,* to mean evidence that was not available at trial and that could not have been discovered earlier through the exercise of due diligence.  *Amrine v. Bowersox,* 238 F.3d 1023, 1030 (8th Cir. 2001).  Additionally, the Eighth Circuit has more recently evaluated the *Amrine* definition of "new evidence" and addressed its application in cases, such as Petitioner's, where the gateway claim is made in an attempt to reach the merits of an ineffective assistance of counsel habeas claim.  *See Kidd v. Norman,* 651 F.3d 947 (8th Cir. 2011) (petitioner argues additional evidence which could have been discovered and presented by his original trial counsel would have proven his innocence).

In *Kidd,* the Eighth Circuit discussed the circuit split[24] over what the Supreme Court in *Schlup* meant by "new reliable evidence."  Most pertinently, the Eighth Circuit considered the Third Circuit's modified approach to situations, such as Petitioner's, where the procedurally defaulted claims include ineffective-assistance-of-counsel claims against trial counsel for not presenting the very evidence a petitioner claims proves his innocence.  *Kidd,* 651 F.3d at 953.  This modified approach by the Third Circuit accepts the *Amrine* definition of "new evidence" "with the narrow limitation that if the evidence was not discovered for use at trial because trial counsel was ineffective, the evidence may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence."  *Id.* at 953 (quoting *Houck v. Stickman*, 625 F.3d 88, 94 (3d Cir. 2010)).  The Eighth Circuit explicitly declined to adopt the Third Circuit's modified approach: "Whatever the merits of a modified approach in situations like the one faced by Kidd, our panel is not at liberty to ignore *Amrine* because we have already applied *Amrine* in situations like Kidd's."  *Kidd,* 651 F.3d at 953 (citing *Nance v. Norris,* 392 F.3d 284, 291 (8th Cir. 2004) (applying *Amrine's* definition of "new evidence" even when one of the procedurally barred claims was an ineffective-assistance-of-counsel claim for failure to investigate, argue, and present evidence that allegedly would have proven the petitioner's innocence.)).  Therefore, the Court must first determine whether the evidence presented by Petitioner at the Habeas Hearing is evidence that was not available at trial and could not have been discovered earlier through the exercise of due

---

[24] "The Seventh and Ninth Circuits have interpreted this phrase to mean evidence is 'new' for purposes of a *Schlup* analysis so long as it was 'not presented' at trial. *Gomez v. Jaimet,* 350 F.3d 673, 679-80 (7th Cir. 2003); *Griffin v. Johnson*, 350 F.3d 956, 962-63 (9th Cir. 2003).  The Third Circuit agrees with the Eighth Circuit that evidence is 'new' only if it was not available at the time of trial through the exercise of due diligence. *See Hubbard v. Pinchak,* 378 F.3d 333, 341 (3d Cir. 2004)."  *Kidd v. Norman*, 651 F.3d at 952.

diligence.  *See Amrine*, 238 F.3d at 1030. *See also Kidd,* 651 F.3d at 953.

At the Habeas Hearing Petitioner presented the following testimony and evidence purporting to support his actual innocence arguments: (1) testimony from Dr. David Lisak, a trauma expert; (2) testimony from Nina Greenham, Petitioner's sister; (3)  thousands of pages of documents including Petitioner's social history records,[25] mental health and medical records, records from Petitioner's incarcerations in the ADC and other facilities, and declarations from various persons.  Further, Petitioner submitted post-hearing briefing specifically citing the evidence presented at the Habeas Hearing that he claims supports his actual innocence contention.  This evidence includes: (1) Arizona Department of Corrections Medical Records Regarding Roger Coulter for January 21, 1986 through August 7, 1988 (Pet's Hearing Ex. 2, Tab 25); (2) Arkansas State Police Capital Case File Regarding Roger Coulter (Pet's Hearing Ex. 2, Tab 8); (3) Declaration of William Edward Coulter dated November 28, 2006 (Pet's Hearing Ex. 2, Tab 214); (4) Declaration of Nina Greenham dated December 17, 2008 (Pet's Hearing Ex. 2, Tab 215); (5) Alameda County Behavioral Health Care Services Medical Records Regarding Roger Coulter from May 1989 (Pet's Hearing Ex. 2, Tab 22); (6) Prison Health Services, Alameda County Jail Medical Records Regarding Roger Coulter from June 1989 (Pet's Hearing Ex. 2, Tab 27); (7) ADC Medical Records Regarding Roger Coulter from 1992 - 2002 (Pet's Hearing Ex. 2, Tab 23); (8) Yuma Regional Medical Center Medical Records Regarding Roger Coulter (Pet's Hearing Ex. 2, Tab

---

[25] Because of the large volume of records presented to the Court at the Habeas Hearing, the Court will not enumerate each title or type of document.  The Court, however, finds that the identification as social history documents adequately describes the category of documents contained in Petitioner's Exhibit 2 and includes, but is not limited to, documents such as birth and death records, school records, social service records, and government records on Petitioner and his family. Further, the Court relies on Petitioner's cites, in his post-hearing briefs, to the evidence Petitioner asserts supports his actual innocence claims.

29); (9) ADC Medical Records regarding Roger Coulter from 1979 through 1989 (Pet's Hearing Ex. 2, Tab 4); and (10) Dr. Simon's Deposition (Resp.'s Hearing Ex. 2).

The majority of the evidence cited by Petitioner at the Habeas Hearing or in his post-hearing brief is not "new evidence" under the *Amrine* standard, and therefore, need not be considered by the Court. *See Amrine*, 238 F.3d 1023; *Bannister v. Delo*, 100 F.3d 610 (8th Cir. 1996). *See also  Nooner v. Hobbs,* 689 F.3d 921 (8th Cir. 2012)*; Osborn v. Purkett*, 411 F.3d 911 (8th Cir. 2005); *Johnson v. Norris*, 170 F.3d 816, (8th Cir. 1999).

### a.      Medical and Mental Health Records

First, Petitioner argues the Arizona Department of Corrections Medical Records regarding Petitioner ("Arizona Records") submitted at the Habeas Hearing show that Petitioner suffered from various mental health illnesses including schizophrenia and depression in the year prior to the offense and that he was medicated for such illnesses.  Petitioner claims these records support his contention that he is actually innocent of capital murder under Arkansas law.  He characterizes these records as hundreds of pages of records detailing Petitioner's treatment by various mental health professionals for his schizophrenia and depression.  The Court, however, will not consider whether the evidence presented in the Arizona Records supports Petitioner's claims that he is innocent of capital murder because this is not "new evidence" as defined by *Amrine.*

The Arizona Records are dated January 21, 1986 through August 7, 1988.  (Pet's Hearing Ex. 2, Tab 25).  Clearly, these records existed in October 1989 at the time of Petitioner's trial. Further, the state court record indicates that Petitioner and his counsel were aware of the existence of the Arizona Records at the time of trial, or at the very least, they were aware of the subject matter of the records.

On August 25, 1989, Dr. Simon, the Supervising Forensic Psychologist at the Arkansas State Hospital issued a Forensic Report on Petitioner at the order of the State court.  In this Report, Dr. Simon details Petitioner's history and notes:

> [Petitioner] does report that he received psychiatric treatment while incarcerated in an Arizona penitentiary between October 1985 and August 1988.  He reports that he was placed in the Special Program Unit and put on psychiatric medication (Navane and Artane) by a physician.

(Trial Ct. Tr. vol. 1, 20, Forensic Report).  Petitioner's trial counsel had access to Dr. Simon's report and used it in support of pretrial motions in state court.  (Trial Ct. Tr. vol. 1, 88, Supplemental Mot. for Allowance of Fees for Expert Witness).  Further, Petitioner's trial counsel represented in court documents that most of Petitioner's mental health records were located out of state.  (Trial Ct. Tr. vol. 1, 55, Mot. for Approval of Fees for Expert Witness).

Dr. Martin, a clinical psychologist that testified on Petitioner's behalf at his trial, also testified to mental health treatment Petitioner reported he received while incarcerated in Arizona:

> [Petitioner] was seen and apparently placed in a special-treatment unit in the Arizona prison system, where he was administered medication, which seems to have been for some, . . . potentially explosive or actually explosive and aggressive behavior in an effort to gain some control of his acting out.

(Trial Tr. vol. 7, 801).

Based on the State record, it is clear that the information contained in the Arizona Records, or the subject matter of the Arizona Records, was known to Petitioner, available at trial, and even considered by Dr. Martin and Dr. Simon in their assessments of Petitioner prior to trial.  Therefore, the Arizona Records are not "new evidence."  *See Bannister,* 100 F.3d at 618 (even though a petitioner may not know an affidavit exists, the affidavit is not "new evidence" when the petitioner knew of the basis of the claims made in the affidavit); *Shaw v. Delo*, 971 F.2d 181, 184 (1992) (it

is common knowledge that prisons keep records and the information contained in such records is of a personal nature, therefore, with reasonable diligence habeas attorney could have discovered the information contained in the petitioner's prison records).

Furthermore, while, Petitioner's trial counsel did not seek to use the Arizona Records to show that Petitioner did not satisfy all of the elements of the crime of capital murder, he nevertheless was aware the information existed and even presented it, through the testimony of Dr. Martin, during the penalty phase of trial. *See Bannister,* 100 F.3d at 618 ("[p]utting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in *Schlup*").

Petitioner also cites to the Alameda County Behavioral Health Care Services Medical Records for Roger Coulter (Pet'r's Hearing Ex. 2, Tab 22) and the Prison Health Services, Alameda County Jail Medical Records Regarding Roger Coulter (Pet'r's Hearing Ex. 2, Tab 27) (collectively "Alameda Records"). Petitioner claims these records support his contention that he is actually innocent of capital murder under Arkansas law and characterizes these records as showing Petitioner was actively psychotic in the weeks following the murder of Natasha Phelps and required anti-psychotic medications at that time. (Pet'r's Post Hearing Br., 68, ECF No. 166). The Court, however, will not consider whether the evidence presented in the Alameda Records supports Petitioner's claims that he is innocent of capital murder because this is not "new evidence" as defined by *Amrine.*

Both sets of records from Alameda County pertain to time periods prior to Petitioner's trial. Specifically, the Alameda County records are from May and June 1989 when Petitioner was arrested in Alameda County, California and housed there waiting transport back to Arkansas.

Clearly, these records existed at the time of trial.

Further, as with the Arizona Records, the trial record indicates that Petitioner and his counsel were aware of the existence of these records and the facts contained within the records. First, Petitioner's trial counsel represented in pre-trial court documents that most of Petitioner's mental health records were located out of state. (Trial Ct. Tr. vol. 1, 55, Mot. for Approval of Fees for Expert Witness). Additionally, on August 25, 1989, Dr. Simon, the Supervising Forensic Psychologist at the Arkansas State Hospital, issued a Forensic Report on Petitioner at the order of the State court. In this Report, Dr. Simon details Petitioner's history, including Petitioner's treatment in Alameda County, and notes:

> We also received a psychiatric report conducted by the criminal justice mental health program on 5-22-89 following [Petitioner's] arrest in California. The evaluator described [Petitioner] as not being acutely psychotic, suicidal, or homicidal. He stated that his memory appeared to be intact and that there was no evidence of hallucinations. He described [Petitioner] as being somewhat suspicious initially, but stated that he became quite open and cooperative as the interview progressed. No delusions or loose associations were noted. His thinking was described as focused and goal directed. He was given a diagnosis of Schizophrenia, paranoid Type by History. However, the evaluator seems to have some questions about this diagnosis as he states "He does not present so much as schizophrenic this evening as he does a explosive, antisocial individual with a very short fuse." A decision was made to place him back on Navane and Artane. On 5-30-89, [Petitioner] was seen by a psychiatrist who reports that he saw no overt evidence of psychosis in [Petitioner]. However, he decided to continue him on his prescribed medication since he appeared to be doing well.

(Trial Ct. Tr. vol. 1, 20, Forensic Report). Petitioner's trial counsel had access to Dr. Simon's report and used it in support of pretrial motions in state court. (Trial Ct. Tr. vol. 1, 88, Supplemental Mot. for Allowance of Fees for Expert Witness). Finally, Dr. Martin, a clinical psychologist that testified on Petitioner's behalf at his trial, testified to mental health treatment Petitioner received in California: "[Petitioner] also reports that he was administered medication

through his contact with the mental health center in California." (Trial Tr., vol. 7, 801).

Based on the State record, it is clear that the existence of the Alameda Records or the subject matter of the Alameda Records was known to Petitioner and his counsel, available at trial, and even considered by Dr. Martin and Dr. Simon in their assessments of Petitioner prior to trial. Therefore, just as the Arizona Records, the Alameda Records are not "new evidence". *See Bannister,* 100 F.3d at 618 (8th Cir. 1996).

Furthermore, as with the Arizona Records, while Petitioner's trial counsel did not seek to use the Alameda Records to show that Petitioner did not satisfy all of the elements of the crime of capital murder, he nevertheless was aware the information existed during the penalty phase of trial. Accordingly, the Alameda Records are not "new evidence." *Id.*

Additionally, Petitioner cites to medical records from an emergency room visit to Yuma Regional Medical Center on October 29, 1985 ("Yuma Records"). (Pet'r's Hearing Ex. 2, Tab 29). Petitioner argues these records support his actual innocence claim by showing that Petitioner has suffered "severe bouts of depression" and tried to commit suicide in 1985.

The Yuma Records clearly existed at the time of trial and Petitioner was well aware of the subject matter of these records—that he attempted suicide in 1985—at the time of trial. Therefore, the Court finds the Yuma Records are not "new evidence" as defined by *Amrine* and need not be considered by the Court for the same reasons stated above. *See Bannister,* 100 F.3d at 618.

Petitioner also cites to mental health records from the ADC for 1979 - 1989 and 1992-2002. (Pet'r's Hearing Ex. 2, Tab 4, 23).[26] Petitioner argues these records support his actual innocence

---

[26] The Court notes that the ADC Records cited to by Petitioner in his Post-Hearing Brief are those at Pet'r's Hearing Ex. 2, Tabs 4 and 23. However, Petitioner also offered into evidence at the hearing an authenticated copy of Petitioner's full accurate and complete mental health records from

claim by showing that the ADC treated Plaintiff for symptoms of psychosis following his arrest, during his pre-trial incarceration, and after his conviction for the murder of Natasha Phelps.

Those ADC Records of Petitioner's mental health treatment prior to his trial existed at the time of trial and are not "new evidence" for the same reasons stated regarding the Arizona Records, Alameda County Records, and Yuma Records. *See Bannister,* 100 F.3d at 618; *Shaw v. Delo*, 971 F.2d at 184.

However, the ADC records cited by Plaintiff at Petitioner's Hearing Ex. 2, Tab 23 and dated from November 1989 - 2003, as well as the ADC records dated November 1989 through April 2013 contained in Petitioner's Exhibit 1C (collectively "New ADC Records") were not available at Petitioner's trial and could not have been discovered earlier through the exercise of due diligence because neither the records nor the subject matter of the records existed at the time of Petitioner's trial. *See Amrine*, 238 F.3d at 1030. Therefore, the Court will consider whether the New ADC Records support Petitioner's constitutional allegations that a jury would not have convicted Petitioner of capital murder or sentenced Petitioner to death in light of this "new evidence." *Id.* at 1029 (citing *Schulp,* 513 U.S. at 327-8).

### b.    Police Case File

Petitioner also presented the Arkansas State Police Capital Case File Regarding Roger Coulter ("Case File"). (Pet'r's Ex. 2, Tab 8) as evidence supporting his actually innocent of capital murder claim. Petitioner argues the Case File supports his actually innocent of capital murder

---

the ADC dating from November 1989 to April 2013. (Pet'r's Hearing Ex. 1C). The records at Exhibit 1C appear to be more complete (or continuos) than those offered at Pet'r's Hearing Ex. 2, Tabs 2 and 23. Therefore, the Court relies on Pet'r's Hearing Ex. 1C in the instances where Pet'r's Hearing Ex. 2, Tabs 2 and 23 are lacking completeness.

claim by showing he discontinued the anti-psychotic medications prescribed in the Arizona Department of Corrections after he was released from that facility, and he was not taking any medication at the time of Natasha Phelps murder.  For the same reasons as stated above, the Court will not consider whether the evidence presented in the Case File supports Petitioner's claims that he is innocent of capital murder because this evidence is not "new" as defined by *Amrine.*  The Case File consists of interviews and evidence gathered between April 1989 and September 1989—all pre-trial.  The Case File existed at the time of Petitioner's trial and was discoverable by due diligence.  *See Amrine*, 238 F.3d at 1030.[27]  Further, the fact that Petitioner was not taking any anti-psychotic medications at the time of the murder was presented at his trial through the testimony of Dr. Martin.  (Trial Tr., vol. 7, 802).

### c.   Testimony, Depositions, and Affidavits

Third, Petitioner argues that the declarations of William Edward Coulter (Pet'r's Ex. 2, Tab 214) and Nina Greenham (Pet'r's Hearing Ex. 2, Tab 215) are evidence supporting his actually innocent of capital murder claims.  William Edward Coulter and Nina Greenham are Petitioner's siblings.  William Coulter executed his declaration on November 28, 2006 and Nina Greenham executed her Declaration on December 17, 2008.  Therefore, neither declaration existed in October 1989 during Petitioner's trial.  Furthermore, neither Nina Greenham nor William Coulter testified at Petitioner's trial. When the declarations were created, however, is not the end of the inquiry. Instead, to determine whether the declarations are "new evidence," the Court must determine whether the facts or evidence contained within the declarations existed at the time of the trial and

---

[27] Petitioner does not allege the state improperly withheld any of the information contained in the police report in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

could have been discovered through due diligence. *See Amrine* 238 F.3d 1030; *see also Bannister,* 100 F.3d at 618; *Johnson v. Norris*, 170 F.3d 816,  818 (8th Cir. 1999) ("There is no showing that [the witness] would not have testified at trial the same way that he did at the habeas hearing had he been asked the right questions, and so we are not entirely satisfied that the evidence was unavailable and could not have been discovered at the time of Ms. Johnson's trial.").

William Edward Coulter is Petitioner's brother and he was also married to Natasha Phelps grandmother at the time of the murder and Petitioner's trial.  In his declaration, William Coulter explained what his childhood was like growing up in the Coulter home including the physical and sexual abuse suffered by the Coulter children.  Petitioner particularly relies on William Coulter's statement that he did not believe Petitioner could have murdered Natasha Phelps if he had been in his right mind.  Further, William Coulter stated in his declaration: "[Petitioner] stopped taking whatever mental medication he was supposed to be taking when he and [Natasha's mother] lived together . . . ."  (Pet'r's Hearing Ex. 2, Tab 214).

Petitioner knew of the factual basis of William Coulter's declaration at the time of trial: Petitioner was aware of the facts surrounding his childhood and also of  the fact that he was no longer taking any mental health medications at the time of the murder.  Further, Dr. Martin, testified at trial that Petitioner was no longer taking his mental health medications at the time of the murder.  (Trial Tr, vol. 7, 802.)  This testimony shows that such evidence was known at the time of the trial and not "new evidence."  Therefore, the Court finds the factual basis of William Coulter's Declaration is not "new evidence" and it will not be considered by this Court.[28]  *See Lee*

---

[28]Furthermore, Petitioner has failed to show that William Coulter would have testified contrary to his declaration at the trial.  William Coulter stated exactly the opposite in his Declaration: "I did not reach out to Roger's attorney, but if he had contacted me, I would have given him the

*v. Kemna,* 213 F.3d 1037, 1039 (8th Cir. 2000) ("[Petitioner] has failed to make the required showing [for an actual innocence claim] because the factual basis for the affidavits he relies on as new evidence existed at the time of the trial and could have been presented earlier.") (abrogated on other grounds *Lee v. Kemna*, 534 U.S. 362 (2002)). *See also Bannister,* 100 F.3d at 618.

Nina Greenham is Petitioner's sister.   Petitioner offers not only Mrs. Greenham's Declaration but also her testimony at the Habeas Hearing.    Mrs. Greenham's declaration and testimony was similar in content to William Coulter's declaration.   In her declaration, Mrs. Greenham details her childhood growing up in the Coulter home until the age of seven when she was adopted by another family.   Particularly, Petitioner relies on a statement by Ms. Greenham in support of his actually innocent claim: "I remember seeing him while he was living with [Natasha's mother] . . . I was too scared to go up and say hello because he did not look like himself.  His hair was long and he had a wild look in his eye. He did not seem mentally well.  Not long after that he was arrested."  (Pet'r's Hearing Ex. 2, Tab 215).

For the same reasons Mr. Coulter's Declaration is not "new evidence," neither is Mrs. Greenham's declaration "new evidence."  All of the information in the declaration was available at the time of the trial.[29]  *See Lee*, 213 F.3d at 1039; *Bannister,* 100 F.3d at 618.

---

information set forth in this declaration and I would have testified to it if called to the witness stand. I would have told the truth about everything he asked." (Pet'r's Hearing Ex. 2, Tab 214).  Therefore, the Court finds William Coulter's declaration is not "new evidence" because its factual predict was available at trial.  Petitioner has offered nothing to contradict William Coulter's statement that  had he been called to testify he would have testified truthfully to the information contained in his declaration.  *See Johnson* 170 F.3d at 818.

[29]Further, Ms. Greenham testified to primarily the same evidence as that contained in her declaration.  Petitioner has not shown that Ms. Greenham would have refused to testify to this same information had she been subpoenaed to do so at the time of trial.  Therefore, Mrs. Greenham's

Petitioner also relied on Dr. Simon's deposition as evidence to support his actual innocence claim. Petitioner relies on Dr. Simon's testimony in his deposition that Petitioner was prescribed anti-psychotic medication while he was incarcerated and awaiting his trial. Further, Petitioner relies on Dr. Simon's testimony that a schizophrenic person who stops taking his medication will likely have his symptoms return. (Resp.'s Hearing Ex. 1, Simon Depo. 33, 90).

Dr. Simon's deposition was taken on March 21, 2013, well after Petitioner's trial. Therefore, the deposition transcript itself did not exist at the time of Petitioner's trial. Dr. Simon, however, is the State of Arkansas's mental health expert that conducted Plaintiff's mental evaluation in 1989 prior to Petitioner's trial. Dr. Simon produced a report, as cited above, detailing his evaluation of Petitioner. (Trial Ct. Tr. vol. 1, 20, Forensic Report). This report, as previously noted, was available to Petitioner and even used by Petitioner in support of pretrial motions in state court. (Trial Ct. Tr. vol. 1, 88, Supplemental Mot. for Allowance of Fees for Expert Witness). Further, Dr. Simon testified during the penalty phase of Petitioner's trial regarding his evaluation of Petitioner. (Trial Ct. Tr. vol. 7, 832). Therefore, Dr. Simon's testimony in his deposition is not "new evidence." *See Amrine* 238 F.3d at 1030.

Further, Petitioner has failed to show that Dr. Simon changed his opinion from that espoused in his 1989 report or that given during his testimony at Petitioner's trial. Additionally, Petitioner failed to show that Dr. Simon would have testified differently at trial had he been asked the questions asked in his deposition. Moreover, as stated multiple times above, Dr. Simon's testimony in his deposition that Petitioner was taking anti-psychotic medication prior to the murder

---

testimony is also not "new evidence" and need not be considered by the Court. *See Johnson*, 170 F.3d at 818.

but not at the time of the murder is a fact that was known to Petitioner at the time of trial and testified to at trial. *See Johnson*, 170 F.3d at 818.

For the reasons stated, the Court finds the New ADC Records are the only "new evidence" that need be considered in analyzing Petitioner's actual innocence claims. *See Amrine,* 238 F.3d at 1029-30.

### 2.   Consideration of "New Evidence"

Now that the Court has determined there was only one set of records presented at the Habeas Hearing that qualify as "new evidence," it will consider whether this evidence establishes Petitioner is actually innocent. As explained above, Petitioner makes two distinct actual innocence gateway claims and each are governed by their own standard of proof. For this reason, the Court will first analyze Petitioner's actual innocent of capital murder claim using the *Schlup* standard and then analyze Petitioner's actual innocent of the death penalty claim using the *Sawyer* standard of proof. *See Schlup*, 513 U.S. at 323-27.

### a.   Actually Innocent of Capital Murder

Petitioner argues the New ADC Records support his gateway claims of actual innocence due to his mental illness. Specifically, Petitioner claims he is actually innocent because he was unable, due to his mental illness, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct and that he was unable to act deliberately, as required for the manifesting extreme indifference to the value of human life element of the capital murder statute.

As previously stated, Petitioner was convicted of capital murder under Ark. Code. Ann. § 5-10-101 (Supp. 1989). Specifically, the jury found Petitioner caused the death of Natasha Phelps

in the course of and in furtherance of the felony of rape under circumstances manifesting extreme indifference to the value of human life. *Coulter v. State,* 304 Ark. 527, 804 S.W.2d 348 (Ark. 1991); (Trial Ct. Tr., vol. 8, 868). The Court must determine whether Petitioner has shown it is more likely than not that no jury would have convicted him in light of the information contained in the New ADC Records thereby entitling Petitioner to consideration of his time barred constitutional claims. *See Amrine,* 128 F.3d at 1230. In doing so the Court will:

> consider all the evidence, including any new evidence, and make a probabilistic determination of what a reasonable, properly instructed juror would do. The appropriate inquiry is whether it is more likely than not that in light of the new evidence no reasonable juror, conscientiously following the judge's instruction requiring proof beyond a reasonable doubt, would vote to convict.

*Amrine*, 128 F.3d at 1230 (internal quotations omitted).

The New ADC Records cited as the relevant "new evidence" to Petitioner's mental health claims are doctors notes from routine evaluations conducted every two months by the ADC psychiatrist, Dr. W.R. Oglesby. (Pet'r's Hearing Ex. 2, Tabs 23-24). After reviewing the entirety of Petitioner's mental health records at Petitioner's Exhibit 2, Tabs 23-24 as well as the authenticated copy of Petitioner's mental health records from the ADC submitted at Petitioner's Exhibit 1C, it does not appear Petitioner received any psychiatric medications or care from November 1989 to August 1993. In November 1989, Dr. Oglesby conducted an initial evaluation and then Petitioner was not seen again by Dr. Oglesby until August 1993 when he reported trouble sleeping, depression and suicidal thoughts. (Pet'r's Hearing Ex. 2, Tabs 23-24).

In November 1989, shortly after his conviction, Dr. Oglesby conducted an initial evaluation of Petitioner. In this evaluation Dr. Oglesby notes in pertinent part:

> [Inmate] said that in 1985 he was placed on Lithium and anti-psychotic drugs while he was

56

in prison . . . When he was paroled from prison in 1988, he got off the medication and did not take any medication at all for about 10 months . . . He gave no history of having symptoms during the time he was off the medicine, however, after he was arrested for his present crime and was placed in jail, he saw a doctor who placed him back on Navane 10 Artane.  When he came into the [ADC] a few days ago, the medication was discontinued.  He said he hears voices and sometimes he feels "paranoid."  He gives a past history of explosive and violent behavior.  He claims amnesia during some of his episodes of anger and rage . . . During the interview today, he did not appear anxious or depressed and there was no evidence of delusional thought disturbances and I could not detect any objective evidence of hallucinations.  I believe that his primary problem is related to a personality disorder and multiple drug abuse.  I am really not certain that he has a schizophrenic disorder and it was decided not to place him on any medication at this time.  He will be observed for any change of his symptoms or behavior.

(Pet'r's Hearing Ex. 1C).

In August 1993, Petitioner reported trouble sleeping, depression, suicidal thoughts, and suspicious thoughts.  Dr. Oglesby placed Petitioner on anti-psychotic medications at that time.  (Pet'r's Hearing Ex. Tabs 23-24).  From June 1994 through February 1996 Dr. Oglesby conducted bimonthly psychiatric evaluations of Petitioner.  During this time, Dr. Oglesby noted Petitioner received different variations of anti-psychotic medications.  Dr. Oglesby also noted different types of symptoms Petitioner reported during this time frame such as depression, suspicion, paranoia, anxiety, restlessness, and hallucinations.  Additionally, Dr. Oglesby noted evaluations in which Petitioner reported he was not suffering any symptoms, and in August 1994, it was Dr. Oglesby's opinion that Petitioner was in remission from his "psychotic symptoms," but Dr. Oglesby continued to medicate Petitioner.  (Pet'r's Ex. 1C).

In February 1996, Dr. Oglesby reported that Petitioner requested to be removed from all medication:

This man said that he wanted to get off his Haldol and other medicine.  He said he was just faking symptoms in order to get medication.  He had been abusing the medication by saving up his benztropine.  He likes to get [the cold and allergy

57

medication] Actified and take excessive amounts of that and get high.  Recently the
infirmary has tighten up their administration of medication policy and no longer
allow inmates to have on person medication.  It is impossible for this man to save
up medication because of that policy so he has decided to get off of his medicine.
He may also be lying about faking the symptoms in the past.

(Pet'r's Hearing Ex. 1C).   At Petitioner's next visit in March 1996, Dr. Oglesby noted that

Petitioner had not required any haloperidol injections and officially discontinued all of Petitioner's

medications. Dr. Oglesby did not schedule Petitioner for any further psychological follow-up

appointments.  It does not appear, from the record before this Court, that Petitioner has required

any further psychiatric care since the discontinuation of his medications in February 1996.  (Pet'r's

Hearing Ex. 1C).

The Court determines Petitioner has failed to show that it is more likely than not, in light

of the New ADC Records, that no reasonable juror would have convicted him of capital murder

due to his mental illness.  While the New ADC Records do indicate that Petitioner was treated for

hallucinations, paranoia, and other psychotic symptoms after his conviction, there is no indication

in these records of Petitioner's mental state at the time of the murder of Natasha Phelps in April

1989.  Further, there are no facts connecting Petitioner's purported mental problems and treatment

in the years after the murder to Petitioner's action at the time of the murder.  *See Shaw v. Delo,*

971 F.2d 181, 187 (8th Cir. 1992) ("Without some facts linking [the petitioner's] mental problems

to the murder, the prison records, family affidavit, and expert opinions fail to show [the petitioner]

did not commit the murder deliberately or without premeditation.  Thus we cannot conclude a

reasonable juror would not have found [the Petitioner] guilty of capital murder.").

Additionally, the New ADC Records present conflicting evidence as to Petitioner's mental

health status.  The records indicate Dr. Oglesby did not initially believe Petitioner suffered from

a schizophrenic disorder.  Further, the records indicate that even though Dr. Oglesby did later place

Petitioner on anti-psychotic medication, Petitioner eventually informed Dr. Oglesby that he was

faking psychotic symptoms in order to receive medications so that he could get high.  Once

Petitioner requested to be removed from the medication, he never again reported a psychotic

symptom.  (Pet'r's Hearing Ex. 2, Tab 23; Pet'r's Hearing Ex. 1C).

Furthermore, at trial the jury heard evidence of Petitioner's deliberate actions surrounding

the day of the murder of Natasha Phelps including evidence detailing facts that Natasha Phelps

body was hidden in a tree trunk and covered with branches and leaves.  There was evidence

presented that, once Petitioner returned home from purportedly taking Natasha to school, he bathed

and changed clothes.  Petitioner then borrowed money from his mother and fled the state.  *See*

*Coulter v. State*, 343 Ark. 22, 26, 31 S.W.3d 826, 828 (Ark. 2000)

Lastly, Dr. Simon testified he did not feel Petitioner had a mental illness that would render

him not responsible for his actions.  (Trial Ct. Tr., vol. 7, 832).

Considering the New ADC Records, the evidence presented at trial, and the lack of

evidence linking Petitioner's mental health symptoms and treatment post-conviction to his actions

at the time of the murder, the Court finds Petitioner has failed to show it is more likely than not

that no reasonable juror would have convicted him of the capital murder of Natasha Phelps in light

of the "new evidence."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

**b.**     **Actually Innocent of the Sentence of Death**

Petitioner's second actual innocence claim is again, not that he did not cause the death of

Natasha Phelps, but that no aggravating factor existed to warrant a death sentence.  While this

claim is another actual innocence gateway claim attempting to over come the AEDPA one-year

statute of limitations, this claim is distinct from Petitioner's first claim of actual innocence.  In this claim, Petitioner argues he is innocent of eligibility for the death penalty because no aggravating circumstances existed to support the sentence of death.  As explained above, this type of actual innocence claim is governed by the standard announced in *Sawyer v. Whitley,* 505 U.S. 333 (1992) which requires a higher standard of proof than actual innocence claims governed by *Schulp*.  Under the *Sawyer* standard, Petitioner "must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty" under Arkansas law.  *See Sawyer*, 505 U.S. at 347-8.

Under Arkansas law, Petitioner was eligible for the death penalty because the jury found him guilty of capital murder, the jury found an aggravating circumstance existed, and the jury found that aggravating circumstances outweighed all of the mitigating circumstances found to exist. *See* Ark. Code. Ann. § 5-4-603(a) (1989).  The jury forms from Petitioner's trial indicate that the jury found:

> One or more aggravating circumstances <u>did</u> exist beyond a reasonable doubt, at the time of the commission of the capital murder . . . The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances . . . The aggravating circumstances when weighed against any mitigating circumstances justify beyond a reasonable doubt a sentence of death.

(Trial Ct. Tr. vol. 1, 122).  The jury found as the aggravating circumstance that:

> The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody.

(Trial Ct. Tr. vol. 1, 122).  Further, the jury found as a mitigating factor:

> Roger Coulter did not have the opportunities of a normal childhood because of the divorce of his parents, the alcoholism of his father, and his placement in foster homes.

60

(Trial Ct. Tr. vol. 1, 122).

Petitioner argues that the evidence he presented at the Habeas Hearing shows that no aggravating circumstances existed to support the death sentence.  Petitioner, however, fails to clearly explain or argue specifically how the evidence presented here negates the aggravating factor found by the jury—that the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody.  It appears Petitioner intended this argument to be that the evidence shows Petitioner lacked the mental capacity to murder Natasha Phelps for the purpose of avoiding or preventing arrest as found by the jury.

First, while the stricter *Sawyer* standard of proof applies to the instant actually innocent of the death penalty claim, *Schlup* still dictates what evidence the Court is to consider in applying this standard of proof.  *See Nave v. Delo*, 62 F.3d 1024, 1033 (8th Cir. 1995).  As explained in detail above, Petitioner has only presented one category of "new and reliable" evidence to be considered by the Court—the New ADC records.  Therefore, the Court need only consider whether Petitioner has shown by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under Arkansas law in light of the New ADC Records.  *See Sawyer*, 505 U.S. 333, 347-8 (1992).

As the Court already determined, Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him in light of the New ADC records.  Similarly, Petitioner has failed to show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of the New ADC Records.  Just as explained above, there is nothing in the New ADC Records linking Petitioner's treatment for psychotic symptoms in the years following the murder of Natasha Phelps to Petitioner's actions

at the time of the murder.  Without such evidence, the Court cannot conclude Petitioner was unable to act deliberately at the time of the murder.  Therefore, Petitioner has failed to show by clear and convincing evidence that no reasonable juror would have found him ineligible for the death penalty based on his mental status.  *See Shaw v. Delo,* 971 F.2d 181, 186-87 (8th Cir. 1992) (finding the petitioner's purported mental deficiencies in support of his actual innocence claim failed to meet the *Sawyer* Standard because the evidence did not present any connection of the purported mental deficiencies to the time of the murder).

Moreover, considering the evidence presented at trial along with the "new evidence," Petitioner has failed to establish he was ineligible for the death penalty.  During the guilt phase of the trial, the jury heard evidence detailing the following facts: Natasha Phelps' body was hidden in a tree trunk and covered with branches and leaves; Petitioner returned home from purportedly taking Natasha to school and bathed and changed clothes; and after bathing and changing clothes, Petitioner borrowed money from his mother and fled the state.  *See Coulter v. State,* 343 Ark. 22, 21 S.W.3d 826 (Ark. 2000).

Additionally, during the penalty phase of the trial the jury heard testimony from Petitioner's own mental health expert, Dr. William Martin, Petitioner's mother, Lavern Temple, and a psychologist for the Arkansas State Hospital, Dr. Michael Simon.[30]

Petitioner's mother Lavern Temple testified that:

Appellant was the eleventh of thirteen children. He was born prematurely and suffered health problems as a result. The family was poor. Appellant was six or seven years old when his parents divorced. His father had a drinking problem, such

---

[30] The ARSC adequately summarized the relevant testimony in its 2000 opinion, therefore, the Court relies on these summaries herein.  *See Coulter v. State,* 343 Ark. 22, 31 S.W.3d 826 (2000).

that when he drank, he would get out of control and threaten Appellant's mother and the children. When his parents divorced, some of the children, including Appellant, were placed in foster homes. He was eventually returned to his mother's home after she remarried. When he was twelve or thirteen, he was placed in reform school for running away from home and refusing to go to school. As an adult, he spent time in prison.

*Coulter v. State,* 343 Ark. 22, 29, 31 S.W.3d 826, 830 (2000). Mrs. Temple also testified that Petitioner's uncle had sexually abused the children but she admitted that she had no personal knowledge that Petitioner had been sexually abused. *Id.*

Dr. Martin, testified on behalf of the Petitioner:

Appellant's father had terrorized the whole family, and his mother had an explosive temper. There was a lot of conflict in the family, and they lived in fear of what their father might do next. During his parents' divorce, some of the children, including Appellant, had been placed in foster homes; two of Appellant's sisters were subsequently adopted by other families. Appellant returned home to his mother and stepfather when he was eight or nine years old. The new family situation was not much better, because his stepfather was a heavy drinker and was strict and abusive. It was at this point that Appellant began to rebel against his parents' authority and ran away from home, which eventually landed him in reform school. Following his experience in reform school, Appellant reported that he had been the victim of a homosexual rape.

Dr. Martin testified further that there was never really any period of stability in the family during Appellant's childhood. He indicated that Appellant had a history of mental problems, and that he had been treated in the past with medication. He stated that Appellant was in the special-treatment unit in the Arizona prison system, where he was administered medication for his aggressive and explosive behavior. Appellant was similarly treated at a California mental-health center. Dr. Martin indicated that Appellant responded well to the medication treatments; however, once he was released from those facilities, he failed to continue with the treatment on his own. Ultimately, Dr. Martin diagnosed Appellant as having antisocial personality disorder and as having demonstrated a pattern of rather heavy alcohol abuse. He stated that Appellant's disorder could be managed with the proper medication, and that the structured nature of prison life would be conducive to that type of treatment. Dr. Martin's diagnosis of Appellant was confirmed by Dr. Michael Simon, who had previously examined Appellant at the Arkansas State Hospital.

*Id.*

Dr. Simon, the state forensic psychologist, testified that, after evaluating Petitioner, he did not feel that Petitioner had a mental disease that would render him incompetent or not responsible for the charges.  Dr. Simon diagnosed Petitioner, as did Dr. Martin, with an antisocial personality disorder with a passive-aggressive feature.  Finally, Dr. Simon testified that he did not find any evidence suggesting that at the time of the murder Petitioner was "under any unusual mental or emotional disturbance that he does not always have."  (Trial Ct. Tr., vol. 7, 832.)

The Court finds, given all of the evidence heard by the jury and the New ADC Records, that Petitioner has failed to show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the Petitioner eligible for the death penalty under Arkansas law.  *See Sawyer*, 505 U.S. 333, 347-8 (1992); *Shaw*, 971 F.2d at 186-87.  The New ADC records failed to show Petitioner lacked the mental capacity to commit the murder of Natasha Phelps in an effort to avoid apprehension.

Finally, Petitioner argues that he is innocent of the death penalty because the mitigation evidence overwhelmingly outweighs any aggravating circumstances.  The Court need not analyze this argument because the law is clear, that in an actual innocence analysis, a habeas court "may not consider the jury's penalty-phase balancing function, and actual innocence refers only to the underlying finding of guilt and the jury's finding of death-qualifying aggravators."  *Wooten v. Norris*, 578 F.3d 767, 781 (8th Cir. 2009); *see also Lingar v. Bowersox*, 176 F.3d 453, 462 (8th Cir. 1999) ("The actual innocence requirement focuses on elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being

introduced as a result of a claimed constitutional error.") (internal quotations omitted).

### 3. All of the Evidence

Alternatively, even if the evidence presented for the first time to this Court were considered along with the record as a whole, the Court finds there is not a "reasonable probability" that a jury would have acquitted Petitioner or found the death-qualifying aggravator inapplicable due to Petitioner's purported mental illness. *Wooten,* 578 F.3d at 781-82. *See also Shaw,* 971 F.2d 186-7 ("Without some facts linking [the petitioner's] mental problems to the murder, the prison records, family affidavit, and expert opinions fail to show [the petitioner] did not commit the murder deliberately or without premeditation. Thus we cannot conclude a reasonable juror would not have found [the Petitioner] guilty of capital murder.").

Petitioner's witnesses and the evidence presented to the Court at the Habeas Hearing did not prove that Petitioner's purported mental illness, psychotic symptoms, or childhood trauma prevented him from formulating the necessary *mens rea* for capital murder or acting deliberately or knowingly to meet the elements of the aggravating factor found by the jury.

Petitioner's expert Dr. Lisak testified that he was unable to offer any opinion on Petitioner's competence at the time of the murder. (Habeas Hearing Tr., 138). Mrs. Greenham did not offer any testimony as to Petitioner's mental capacity at the time of the murder, but her Declaration, along with Mr. Coulter's declaration, indicated that Petitioner was not himself during the time prior to the murder. (Pet'r's Hearing Ex. 2, Tabs 214-15).

Additionally, Dr. Simon, enumerated in his report on Petitioner (Trial Ct. Tr., vol. 1, 20, Forensic Report) and testified in his deposition (Resp't's Hearing Ex. 1, 83-4) and at Petitioner's trial (Trial Ct. Tr., vol. 7, 832) that he believed Petitioner did not suffer from a psychotic disorder

and was fully competent at the time of the rape and murder of Natasha Phelps.

Finally, Petitioner's mental health records are contradictory or inconclusive as to whether he suffered a psychotic disorder at the time of Natasha Phelps murder. The Arizona Records showed Petitioner received some mental health treatment for a psychotic disorder in the years proceeding the murder. (Pet'r's Hearing Ex. 2, Tab 25). The Alemada Records showed Petitioner was diagnosed as schizophrenic based on the mental health history he provided the evaluating doctor, and that he was treated with anti-psychotic medications. But the evaluating doctor noted that Petitioner did not present "so much as schizophrenic . . . as he does a explosive, antisocial individual with a very short fuse . . . ." (Pet'r's Hearing Ex. 2, Tabs 22, 27). The Yuma Records showed Petitioner attempted suicide in October 1985. (Pet'r's Hearing Ex. 2, Tab 29). The New ADC Records show that while Petitioner received anti-psychotic medication for years after his incarceration for the murder of Natasha Phelps, Petitioner later indicated he had faked psychotic symptoms to obtain medication in order to get high, his medication was discontinued, and Petitioner suffered no further psychotic symptoms and needed no further mental health treatment. (Pet'r's Hearing Ex. 1C).

This evidence not only fails to support Petitioner's contention that he suffered from a psychotic disorder at the time of Natasha Phelps murder, there is no evidence cited indicating, that due to this disorder or symptoms of such a disorder, Petitioner was unable to appreciate the criminality of his conduct, conform his conduct to the requirements of the law, form the requisite *mens rea* for capital murder at the time of the murder of Natasha Phelps, or deliberately cause the death of Natasha Phelps for the purpose of avoiding or preventing an arrest or effecting an escape from custody. Therefore, even considering all of the evidence cited to by Petitioner, the Court

finds that Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him in light of the "new evidence," *Schlup,* 513 U.S. at 327, and that Petitioner has failed to show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty, *Sawyer*, 505 U.S. at 347-8.

## CONCLUSION

For the reasons stated herein, the Court finds (1) Respondent's Motion to Amended Response (ECF No. 98) is hereby **GRANTED** and the document filed at ECF No. 98 is construed by the Court as Respondent's Amended Response to Petitioner's Second Amended Petition; and (2) Petitioner's original and all subsequent Petitions are time barred by the AEDPA one year statute of limitations and Petitioner is not entitled to equitable tolling.   Therefore, Petitioner's Second Amended Petition (ECF No. 44) should be and hereby is **DISMISSED** with prejudice. A Judgment of even date consistent with this Opinion will be entered by the Court.

**IT IS THEREFORE ORDERED** this 31st day of March 2015.


/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge